**SIERRA CLUB, Appellant,**

v.

**R. Max PETERSON, in his official capacity as Chief Forester of the United States Forest Service, Department of Agriculture, et al.**

**No. 82–1695.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1983.

Decided Sept. 13, 1983.

As Amended Sept. 28, 1983.

Karin P. Sheldon, Denver, Colo., for appellant.

Claire L. McGuire, Atty., Dept. of Justice, Washington, D.C., with whom Robert L. Klarquist, Washington, D.C., was on the brief for appellees, U.S.A.

R. Brooke Jackson, Denver, Colo., with whom John F. Shepherd, Denver, Colo., was on the brief for appellees, Wexpro Company, et al.

Gerry Levenberg, Washington, D.C., was on the brief for Bill J. Maddon, et al.

Before WRIGHT and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

In proceedings in the district court, the Sierra Club challenged the decision by the United States Forest Service (Forest Service) and the Department of the Interior (Department) to issue oil and gas leases on lands within the Targhee and Bridger-Teton National Forests of Idaho and Wyoming. The plaintiff alleged that the leasing program violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (1976), because no Environmental Impact Statement (EIS) was prepared prior to the action. On cross-motion for summary judgment the district court upheld the decision to issue the leases without preparing an EIS. *Sierra Club v. Peterson,* No. 81–1230 (D.D.C. March 31, 1982). The plaintiff appeals from a portion of the judgment and we reverse the decision of the district court.

## I.

The land originally involved in this dispute encompassed a 247,000 acre roadless area in the Targhee and Bridger-Teton National Forests of Idaho and Wyoming, known as the Palisades Further Planning Area. In its most recent Roadless Review

and Evaluation, RARE II,[1] the Forest Service designated this entire area as a Further Planning Area and consequently, the land may be considered for all uses, including oil and gas exploration, as long as its potential wilderness quality is preserved.

In 1980, the Forest Service received applications for oil and gas leases in the Palisades Further Planning Area.[2] After conducting an Environmental Assessment (EA), the Forest Service recommended granting the lease applications, but with various stipulations attached to the leases. Because the Forest Service determined that issuance of the leases with the recommended stipulations would not result in significant adverse impacts to the environment, it decided that, with respect to the *entire* area, no Environmental Impact Statement was required at the leasing stage.

The leasing program approved by the Forest Service divides the land within the Palisades Further Planning Area into two categories—"highly environmentally sensitive"[3] lands and non-highly environmentally sensitive lands. The stipulations attached to each lease are determined by the particular character of the land. All of the leases for the Palisades contain "standard"[4] and "special"[5] stipulations. These stipula-

tions require the lessee to obtain approval from the Interior Department before undertaking any surface disturbing activity on the lease, but do not authorize the Department to *preclude* any activities which the lessee might propose. The Department can only impose conditions upon the lessee's use of the leased land.

In addition, a No Surface Occupancy Stipulation (NSO Stipulation) is attached to the leases for lands designated as "highly environmentally sensitive." This NSO Stipulation *precludes* surface occupancy unless and until such activity is specifically approved by the Forest Service.

For leases *without* a No Surface Occupancy Stipulation, the lessee must file an application for a permit to drill prior to initiating exploratory drilling activities. The application must contain a surface use and operating plan which details the proposed operations including access roads, well site locations, and other planned facilities. On land leased without a No Surface Occupancy Stipulation the Department *cannot* deny the permit to drill; it can only impose "reasonable" conditions which are designed to mitigate the environmental impacts of the drilling operations. *See* Joint Appendix (JA) at 86a.

1. Two Roadless Area Review and Evaluations (RARE I and II) were conducted by the Forest Service to evaluate undeveloped areas within National Forests in order to recommend appropriate areas to Congress for designation as part of the National Wilderness Preservation System. *See* Wilderness Act, 16 U.S.C. § 1131 *et seq.* (1976).

   As a result of RARE II, areas studied by the Forest Service were classified as either Wilderness, Non-wilderness or Further Planning Areas. Further Planning Areas, such as the Palisades, are lands which require additional, more intensive study before the Forest Service can recommend Wilderness or Non-wilderness status to Congress. Until a decision is reached on the ultimate status of the land, its present character is to be maintained.

2. The Mineral Leasing Act of 1920, 30 U.S.C. § 226 (1976), authorizes the leasing of lands owned by the United States for the purpose of oil and gas exploration and development.

3. "Highly environmentally sensitive" areas are defined in the Environmental Assessment as

those areas "with definable environmental characteristics which would be irreversibly altered by exploration activities." Environmental Assessment for Oil and Gas Exploration in the Palisades Further Planning Area, Joint Appendix (JA) at 150. These areas include lands necessary for the protection of threatened or endangered wildlife species; lands with slope gradients of more than 40%; lands with regionally unique plant or animal species; and lands with significant cultural resources. *Id.*

4. The "standard" stipulations include the Stipulation for lands under jurisdiction of the Department of Agriculture, 3109-3 (JA at 85), the Surface Disturbance Stipulation, 3109-5 (JA at 86a), and the Forest Service Supplement to Form 3109-3 (JA at 87).

5. "Special" stipulations include the Further Planning Area Stipulation, the Coordination Exploration Stipulation: Standard and Jackson Hole Area and others which are specially designed to protect particular environmental concerns. *See, e.g.*, JA at 89-100.

## II.

Following an unsuccessful administrative challenge to the decision to issue all the leases in accord with the Forest Service's plan, the Sierra Club sought declaratory and injunctive relief in the United States District Court for the District of Columbia. The Sierra Club argued that leasing land within the Palisades without preparing an EIS violated NEPA. The federal defendants [6] responded that because of the finding of "no significant impact" contained in the Environmental Assessment, it was not necessary to prepare an EIS.

The district court upheld the finding of "no significant impact" and the decision to lease without preparing an EIS. The court based its decision upon the conclusion that the lease stipulations were valid and that the government could thereby "preclude any development under the leases." *Sierra Club v. Peterson,* No. 81–1230, slip op. at 12 n. 5 (D.D.C. March 31, 1982). The court granted the federal defendants' motion for summary judgment, stating that "[t]he stipulations included in the leases ... will effectively insure that the environment will not be significantly affected until further analysis pursuant to NEPA." *Id.* at 13–14.

The Sierra Club appeals only that portion of the district court's judgment which involves lands leased *without* a No Surface Occupancy Stipulation. The Sierra Club concedes that the Department retains the authority to preclude all surface disturbing activities on land leased with a NSO Stipulation until further site-specific environmental studies are made. By retaining this authority, the Department has insured that no significant environmental impacts can occur from the act of leasing lands subject to the NSO Stipulation.

Approximately 80% of the Palisades was designated as highly environmentally sensitive and, therefore, leased *with* the NSO Stipulation. Only the remainder, approximately 28,000 acres, is at issue in this appeal. As to this smaller area, the Sierra Club contends that the Department cannot *preclude* surface disturbing activities, including drilling, on lands leased without the NSO Stipulation. The Department has only retained, Sierra Club asserts, the authority to "condition" surface disturbing activities in an effort to "mitigate" any environmental harm which might result from the activities. Thus, *some* surface disturbing activities may result from the act of issuing leases without NSO Stipulations on lands within the 28,000 acres. Appellant asserts, therefore, that the finding of "no significant impact" and the decision not to prepare an EIS, insofar as land leased within this smaller area is concerned, was improper. Because on these leases the Secretary cannot *preclude* surface disturbing activity, including drilling, the Sierra Club argues that the decision to lease is itself the point of irreversible, irretrievable commitment of resources—the point at which NEPA mandates that an environmental impact statement be prepared. We agree.

## III.

The National Environmental Policy Act (NEPA) requires preparation of an Environmental Impact Statement whenever a proposed major federal action will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C) (1976). To determine the nature of the environmental impact from a proposed action and whether an EIS will be required, federal agencies prepare an environmental assessment. 40 C.F.R. § 1501.4(b) & (c) (1982). If on the basis on the Environmental Assessment the agency finds that the proposed action will produce "no significant

---

6. The lessees were allowed to intervene as defendants in the district court proceedings. The "Wexpro" intervenors include Wexpro Co., Sun Exploration and Production Co., Anschutz Corp., and Champlin Petroleum Co. These companies hold the majority of the leases on the Idaho portion of the Palisades. The "Maddox" intervenors include Bill J. Maddox, Ruth Maddox, Kenneth F. Cummings, A.W. Fleming and Co., and Placid Oil Co. These individuals and enterprises are also lessees of the lands at issue.

Both groups of intervenors participated in this appeal.

impact" on the environment, then an EIS need not be prepared. *Id.* at § 1501.4(e).

■ An agency's finding of "no significant impact" and consequent decision not to prepare an EIS can only be overturned if the decision was arbitrary, capricious, or an abuse of discretion. *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 681 (D.C.Cir.1982); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). Judicial review of an agency's finding of "no significant impact" is not, however, merely perfunctory as the court must insure that the agency took a "hard look" at the environmental consequences of its decision. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

■ Cases in this circuit have employed a four-part test to scrutinize an agency's finding of "no significant impact." The court ascertains

(1) whether the agency took a "hard look" at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Cabinet Mountains Wilderness, supra,* 685 F.2d at 682. Applying the foregoing test to this agency decision, we are satisfied that the agency has taken the requisite "hard look" and has "identified the relevant areas of environmental concern." However, in our opinion, the finding that "no significant impact" will occur as a result of granting leases *without* an NSO Stipulation is not supportable on this record.

The finding of "no significant impact" is premised upon the conclusion that the lease stipulations will prevent any significant environmental impacts until a site-specific plan for exploration and development is submitted by the lessee. At that time, the federal appellees explain, an appropriate environmental analysis, either an Environmental Assessment or an EIS, will be prepared. In bifurcating its environmental analysis, however, the agency has taken a foreshortened view of the impacts which could result from the act of *leasing.* The agency has essentially assumed that leasing is a discrete transaction which will not result in any "physical or biological impacts." The Environmental Assessment concludes

that there will be no significant adverse effects on the human environment due to oil and gas lease issuance. Therefore, no environmental impact statement will be prepared. The determination was based upon consideration of the following factors ... (a) few issued leases result in active exploration operations and still fewer result in discovery or production of oil or gas; (b) the act of issuing a lease involves no physical or biological impacts; (c) the cumulative environmental effect of lease issuance on an area-wide basis is very small; (d) effects of lease activities once permitted will be mitigated to protect areas of critical environmental concern by appropriate stipulations including no-surface occupancy; (e) if unacceptable environmental impacts cannot be corrected, activities will not be permitted; and (f) the action will not have a significant effect on the human environment.

Finding of No Significant Impact, Environmental Assessment, JA at 26–27. The conclusion that no significant impact will occur is improperly based on a prophecy that exploration activity on these lands will be insignificant and generally fruitless.

While it may well be true that the majority of these leases will never reach the drilling stage and that the environmental impacts of exploration are dependent upon the nature of the activity, nevertheless NEPA requires that federal agencies determine at the outset whether their major actions can result in "significant" environ-

mental impacts. Here, the Forest Service concluded that any impacts which might result from the act of leasing would either be insignificant or, if significant, could be mitigated by exercising the controls provided in the lease stipulations.

Even assuming, *arguendo,* that all lease stipulations are fully enforceable, once the land is leased the Department no longer has the authority to *preclude* surface disturbing activities even if the environmental impact of such activity is significant. The Department can only impose "mitigation" measures upon a lessee who pursues surface disturbing exploration and/or drilling activities. None of the stipulations expressly provides that the Department or the Forest Service can *prevent* a lessee from conducting surface disturbing activities.[7] Thus, with respect to the smaller area with which we are here concerned, the decision to allow surface disturbing activities has been made at the *leasing stage* and, under NEPA, this is the point at which the environmental impacts of such activities must be evaluated.

■ NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment. The purpose of an EIS is to insure that the agency considers all possible courses of action and assesses the environmental consequences of each proposed action. The EIS is a decision-making tool intended to "insure that

... environmental amenities and values may be given appropriate consideration in decisionmaking ...." 42 U.S.C. § 4332(2)(B). Therefore, the appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options. *Environmental Defense Fund v. Andrus,* 596 F.2d 848, 852–53 (9th Cir.1979). *Accord, Port of Astoria v. Hodel,* 595 F.2d 467, 478 (9th Cir.1979) (NEPA requires that an EIS be prepared "at an early stage when alternative courses of action are still possible. . . ."); *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1094 (D.C. Cir.1973) (In determining *when* to prepare an EIS the agency must ascertain to what extent its decision embodies an "irretrievable commitment" of resources which precludes the exercise of future "options."). An EIS is required when the "critical agency decision" is made which results in "irreversible and irretrievable commitments of resources" to an action which will affect the environment. *Mobil Oil Corp. v. F.T.C.,* 562 F.2d 170, 173 (2d Cir.1977). On the facts of this case, that "critical time," insofar as lands leased without a NSO Stipulation are concerned, occurred at the point of leasing.

Notwithstanding the assurance that a later site-specific environmental analysis will be made, in issuing these leases the Department made an irrevocable commitment to allow *some* surface disturbing activities, in-

---

7. We do not agree with the district court's unsupported conclusion that the Secretary can preclude "any development" under the lease. *Sierra Club, supra,* slip op. at 12 n. 5. In addition to the fact that the lease stipulations themselves do not expressly permit preclusion, when questioned on this point at oral argument, counsel for the government stated:

> The government has never contended that we would preclude all development. We did in fact contend before the district court . . . that in the Conditional No Surface Occupancy areas, those that are highly sensitive, we could preclude development.

In response to the court's question as to whether the agency could refuse to approve a lessee's plan to build an access road (a surface disturbing activity) during exploration, counsel for the government stated:

> There's a very fine line between preclusion and strict control. The agency has retained

strict control. They have the authority. They have the right to put certain conditions on road building.
> [The government has] never contended that we could preclude all exploration and all development in these non-highly sensitive areas.

Furthermore, counsel for the Sierra Club asserted without contradiction that the government could not *deny* an application for a permit to drill, but could only enforce the lease stipulations to control and/or mitigate any environmental damage which result from the drilling.

We conclude from the language of the lease stipulations, the briefs of the parties, and the statements of counsel at oral argument that once the land is leased the Secretary cannot *preclude* surface disturbing activities, in either the exploratory or the development stage, on the 28,000 acres here in question.

cluding drilling and roadbuilding. While theoretically the proposed two-stage environmental analysis may be acceptable, in this situation the Department has not complied with NEPA because it has sanctioned activities which have the potential for disturbing the environment without fully assessing the possible environmental consequences.

The Department asserts that it cannot accurately evaluate the consequences of drilling and other surface disturbing activities until site-specific plans are submitted. If, however, the Department is in fact concerned that it cannot foresee and evaluate the environmental consequences of leasing without site-specific proposals, then it may delay preparation of an EIS provided that it reserves both the authority to *preclude* all activities pending submission of site-specific proposals and the authority to *prevent* proposed activities if the environmental consequences are unacceptable. If the Department chooses not to retain the authority to *preclude* all surface disturbing activities, then an EIS assessing the full environmental consequences of leasing must be prepared at the point of commitment—when the leases are issued. The Department can decide, in the first instance, by which route it will proceed.

## IV.

The National Environmental Policy Act requires federal agencies to evaluate the environmental consequences of their actions *prior* to commitment to any actions which might affect the quality of the human environment. If *any* "significant" environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken.

In this case, the Department failed to fully assess the environmental consequences of its decision to issue leases without NSO Stipulations on the 28,000 acres in question. To comply with NEPA, the Department must either prepare an EIS prior to leasing or retain the authority to preclude surface disturbing activities until an appropriate environmental analysis is completed. If the

Department retains the authority to preclude *all* surface disturbing activities pending submission of a lessee's site-specific proposal as well as the authority to refuse to approve proposed activities which it determines will have unacceptable environmental impacts, then the Department can defer its environmental evaluation until such site-specific proposals are submitted. If, however, it is unable to *preclude* activities which might have unacceptable environmental consequences, then the Department cannot issue leases sanctioning such activities without first preparing an EIS.

Because we find that the Department did not comply with the requirements of the National Environmental Policy Act when it leased the 28,000 acres of non-highly environmentally sensitive lands within the Palisades, we reverse the judgment of the district court and remand the case for further proceedings not inconsistent with this opinion.

*Judgment accordingly.*