**ANACOSTIA WATERSHED SOCIETY, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**Civ. A. No. 93–1286 PLF.**

United States District Court, District of Columbia.

Dec. 9, 1994.

---

Howard Irving Fox and Fern L. Shepard, Washington, DC, for plaintiffs.

Daniel Van Horn, Washington, DC, for defendants.

## OPINION

FRIEDMAN, District Judge.

The Anacostia Watershed Society and several other environmental and community organizations [1] brought suit against the Secretary of the Interior, the Department of the Interior, the National Park Service, and the Regional Director of the National Capital Regional Office of the Park Service, alleging violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act. Plaintiffs challenge the decision of the National Park Service to transfer jurisdiction over certain portions of Anacostia National Park—Heritage Island and the southern portion of Kingman Island—to the District of Columbia for the development of a National Children's Island theme park. Plaintiffs contend that defendants' failure to

---

1. The other plaintiffs are the Kingman Park Civic Association, the Capitol Hill Restoration Society, the Committee of 100 on the Federal City, the National Parks and Conservation Association, and the Sierra Club.

prepare an environmental assessment or an environmental impact statement prior to effecting the transfer violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the regulations under the Act, 40 C.F.R. § 1500 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* Plaintiffs seek a declaratory judgment that the transfer decision violates NEPA and its implementing regulations, and rescission of the transfer decision. The case is before the Court on cross-motions for summary judgment.

## I. FACTUAL BACKGROUND

The material facts in this case are not disputed. The National Park Service holds title to and is responsible for managing Anacostia Park, which is located in the southeastern quadrant of Washington, D.C., and borders on the Anacostia River. Anacostia Park includes two islands that are the subject of this dispute: Heritage Island and a portion of Kingman Island.

The National Capital Planning Commission ("NCPC") is "the central Federal planning agency for the Federal Government in the National Capital." 40 U.S.C. § 71a(a)(1). In 1968, the NCPC approved general development concepts for a recreational facility in Anacostia Park. A.R. 1395.

In 1975, the District of Columbia proposed the development of a children's recreational facility at the site as part of the nation's bicentennial celebration. The District of Columbia Office of Environmental Planning and the National Park Service each prepared an environmental assessment for the plan. A.R. 31–35; 15–30. Subsequently, the Park Service and the District entered into a three year memorandum agreement to facilitate the bicentennial project. A.R. 1032. The bicentennial plan called for a short term, seasonal demonstration project with a minimum of permanent structures to be built on park land. The project entailed development of a public facility owned by the Park Service and operated by the District of Columbia. The Park Service retained authority to review and approve or preclude all development plans for the islands. A.R. 1034–35.

In 1977, the NCPC extended to January 15, 2002, its approval of the final site and building plan for the recreational project. A.R. 1739. The Park Service submitted a supplemental environmental assessment as part of its request for the extension, finding that the project contemplated was "not substantially changed since the previous assessment." A.R. 10.

In 1978, the Park Service and the District of Columbia entered into a memorandum of agreement to last until September 30, 2000, to aid in the effort to develop the property as a children's recreational site. A.R. 1051. In the memorandum, the District agreed to prepare an environmental assessment addressing all facets of the proposed development and to prepare an environmental impact statement if required. A.R. 1053. Later that year, the agreement was amended to make clear that the District of Columbia held "exclusive operational authority" over the land. A.R. 1057–58.

In 1982, the District entered into an agreement with National Children's Island, Inc. ("NCI"), a non-profit corporation, to select a developer for the project, which had become known as the National Children's Island. A.R. 1059. In 1983, NCI selected Playland Corporation, now known as Island Development Corporation ("IDC"), a for-profit corporation, to manage the project's development and arrange financing. A.R. 1065. After 1983, public funds were no longer available for the development. Thus, to financially support the costs of development, greater density of structures and year-round attractions were suggested as a part of the proposed Children's Island project. A.R. 1527–28.

In November 1992, the Park Service requested the National Capital Planning Commission to consider whether the Park Service should transfer jurisdiction over portions of Anacostia Park to the District of Columbia. A.R. 1411. On December 22, 1992, the NCPC completed an environmental assessment and issued a finding of no significant impact. A.R. 1–2. On December 30, 1992, without preparing its own environmental assessment or environmental impact statement, the Park Service transferred jurisdiction

over portions of Kingman Island and Heritage Island to the District of Columbia. The purpose of the transfer was to facilitate construction of the National Children's Island. A.R. 1402.

The Record of Decision issued by the Park Service in support of the transfer of jurisdiction to the District stated that "it has become apparent that placing the area under the jurisdiction of a single entity will be more efficient and productive in the realization of the long planned National Children's Island." A.R. 1402. The decision stated that the transfer is conditioned on permitting only limited development of the property. It required that improvements to the property be reviewed and approved by the NCPC and the Commission of Fine Arts. It also required that the District of Columbia, "as the sponsoring agency," comply with NEPA. The Record of Decision concluded that "[t]here is no environmental impact effect [sic] upon the property by the conditioned transfer of the property" and that "no environmental analysis is required by the National Park Service as a part of this land transfer action." *Id.* The Park Service did not mention or allude to the NCPC environmental assessment in the Record of Decision.

On January 7, 1993, the National Capital Planning Commission approved the transfer of jurisdiction. A.R. 1391. On May 13, 1993, the District of Columbia, NCI and IDC entered into a 30 year lease on the property, with a 30 year renewal option. Lease, Exhibits and Declarations in Support of Plaintiffs' Motion for Summary Judgment, Exhibit 8. Prior to issuing its decision to approve the transfer of jurisdiction, the Park Service had been provided with a copy of the proposed lease, which was nearly identical to the one the parties ultimately signed on May 13, 1993. Defendants' Answer at ¶ 37; A.R. 1413.

The lease grants National Children's Island, Inc. the "exclusive right to use and operate, and an exclusive possessory interest in," portions of Kingman Island and Heritage Island. Lease, Exhibit 8 at 4; *see also* A.R. 1416. In addition to requiring the developer to build a Children's Playground free to the public, the lease provides that

the Project may include, without limitation, any one or more of the following: (i) landscaped environment with trees, shrubs, flowers, lawns, gardens, reflection pools, fountains and play areas, (ii) exhibitions and pavilions, (iii) restaurants, food courts and other food vending facilities (with indoor and/or outdoor seating and/or carry-out facilities), (iv) concession stands and souvenir shops, (v) exhibits and rides, (vi) indoor and/or outdoor facilities for live or recorded musical, theatrical or other performances, (vii) ticket, administrative and other offices and related support facilities, (viii) parking and utility facilities, equipment and related apparatus, and (ix) new or expanded bridges connecting the Islands to the adjacent parklands ...

Lease, Exhibit 8 at 5; *see also* A.R. 1416. The lease also sets out design parameters, including requirements that buildings and structures shall not exceed 50 feet in height, "[b]uilding footprints shall not exceed a total of more than five (5) acres" and "[p]aved surfaces, including paved areas occupied by structures, but not including the areas occupied by buildings, shall not exceed twenty-three percent" of the premises. Lease, Exhibit 8 at 12; *see also* A.R. 1423. The lease requires Island Development Corporation to prepare an environmental assessment and, if required, an environmental impact statement. Lease, Exhibit 8 at 5; *see also* A.R. 1417. The lease also obligates the parties to comply with the terms of the official Transfer of Jurisdiction plat. Lease, Exhibit 8 at 3–4; *see also* A.R. 1415–16.

On August 14, 1993, the Park Service signed the official Transfer of Jurisdiction plat. A.R. 1852. The Transfer of Jurisdiction plat states that "[t]he Recreational Park shall only be used for the purposes of constructing and operating a cultural, educational and family-oriented recreational park" and that the lands designated as "[t]he Playground shall only be improved and maintained as a children's playground available to the public free of charge." Defendants' Answer at 7; A.R. 1376. It repeats the design parameters contained in the Lease between the District, NCI and IDC. A.R. 1376. It provides that the District's authority over the

property will revert to the National Park Service if certain conditions are not met, including the failure to commence improvement of the property within a certain period of time and abandonment of the property. A.R. 1377. It also requires that "[n]o modification of the landscape of the Property shall be made prior to completion of all environmental compliance required by Federal or District of Columbia law or regulation...." A.R. 1376. Reiterating the Record of Decision, the Transfer of Jurisdiction plat states that only the NCPC and the Commission of Fine Arts are required to review and approve development of the islands for the federal government. A.R. 1376, 1402.

The transfer became complete when it was accepted by the District of Columbia government, approved by the District of Columbia City Council, signed by the Mayor of the District of Columbia, and submitted to Congress for a 30 day review period, which elapsed with Congress's having taken no action. *See* 40 U.S.C. § 122; D.C.Code § 8–111. On July 13, 1993, the City Council also approved an agreement between the District, NCI and IDC covering the construction and financing of the proposed project. 40 D.C.Reg. 5515 (1993).

The Park Service did not prepare an environmental impact statement evaluating the impacts of or alternatives to its decision to transfer jurisdiction. Nor did it prepare an environmental assessment evaluating whether an environmental impact statement should be prepared. The Park Service did not invoke a categorical exclusion from NEPA's requirements. The question before the Court is whether the Park Service was required to prepare its own environmental impact statement or environmental assessment before transferring jurisdiction over Heritage Island and portions of Kingman Island to the District of Columbia.

## II. DISCUSSION

### A. *This Matter Is Ripe For Decision*

■ Defendants argue that this case should be dismissed because it is not ripe for decision. In determining whether a case is ripe, the Court must consider (1) the fitness of the issue for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). The rationale behind the ripeness doctrine is that the courts should not involve themselves prematurely and should wait until an administrative decision "has been formalized and its effects felt in a concrete way" by the plaintiffs. *Id.* Under the APA, the fitness of the issue may be evaluated as a question of whether the agency action involved is "final agency action." 5 U.S.C. § 704; *see Public Citizen Health Research Group v. Commissioner, Food & Drug Admin.,* 740 F.2d 21, 30 (D.C.Cir.1984).

■ The Record of Decision and official Transfer of Jurisdiction plat demonstrate that the Park Service's decision to transfer jurisdiction to the District of Columbia was a final agency action. A.R. 1401–1403; 1852. There is simply nothing left for the Park Service to do. Indeed, defendants conceded in open court that the transfer of jurisdiction was a final agency action, stating that the Park Service is "no longer in the loop" and acknowledging that it has no further decisions to make with respect to the transferred properties. The Court therefore finds that the transfer of jurisdiction was a final agency action and concludes that the issue of its legality is fit for judicial decision.

While finality of agency action is the key consideration in ripeness analysis, *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 435–36 (D.C.Cir.1986), plaintiffs have also shown that defendants' failure to make a properly informed decision in compliance with NEPA has harmed them in a number of ways. First, the Park Service's transfer of jurisdiction over the lands means that the protective rules governing the Park Service's management of Anacostia Park no longer apply to Heritage Island and portions of Kingman Island. Gone is the Park Service's authority to limit the leasing of National Park lands, to protect the value and integrity of the lands and to preclude or regulate development. *See, e.g.,* 16 U.S.C. §§ 1a–1, 1a–2(g), 1a–7(c), 3, 20–20g. The District of Columbia, to whom jurisdiction has been transferred, has

no similar restrictions on its management of these lands.

Second, the transfer of jurisdiction to the District of Columbia facilitated and authorized potentially intrusive development. A.R. 1376–78. Immediately following the decision to transfer, the District, NCI and IDC signed a 30–year renewable lease setting out terms and conditions for the development of the properties, a lease that could not have been signed without the transfer. The lease authorizes, "without limitation," the construction of pavilions, restaurants, food courts, concession stands, souvenir shops, facilities for theatrical performances, exhibits and rides. Lease, Exhibit 8 at 4–5. Furthermore, the transfer of jurisdiction means that the lands will no longer be reserved for public purposes. 40 D.C.Reg. 5515 (1993).

Finally, because no subsequent Park Service review will occur before development begins, the plaintiffs' proposed alternative use for the land—that it be retained as a minimally developed public park subject to Park Service control—effectively is foreclosed. Subsequent decisions will be made by the District of Columbia or the National Capital Planning Commission. For these reasons, the Court finds that the plaintiffs have alleged sufficient hardships to satisfy the second prong of *Abbott Laboratories.*[2]

*B. The National Park Service Violated NEPA By Failing To Prepare An Environmental Impact Statement Or Environmental Assessment*

■ The National Park Service prepared no environmental impact statement and no environmental assessment in connection with its 1992 decision to transfer jurisdiction of National Park lands to the District of Columbia. It also failed to invoke a categorical exclusion under section 1501.4 of the NEPA regulations and is precluded from doing so at this time. 40 C.F.R. § 1501.4(a)(2); *see Fund for Animals, Inc. v. Espy,* 814 F.Supp. 142, 150–51 (D.D.C.1993) (categorical exclusion must be invoked prior to approving agency action; invocation of categorical exclusion after complaint filed is a *post hoc* rationalization and is inadequate as a basis for review).

The Park Service contends that NEPA does not apply to its decision to transfer jurisdiction. It argues that its decision not to prepare either an environmental impact statement or an environmental assessment is reasonable because the transfer decision has no significant environmental impacts. It claims that the transfer is a mere paper transaction that does not change the status quo. The Park Service also argues that its decision not to prepare an environmental impact statement or environmental assessment was reasonable because it would have been premature to comply with NEPA at the time jurisdiction was transferred to the District of Columbia. It asserts that any potential environmental effects are indefinite until development plans are submitted.

NEPA provides that a federal agency must prepare an environmental impact statement for "proposals for ... major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3. When considering a proposed action under NEPA, an agency must first determine whether the action is one that normally requires or one that normally does not require an environmental impact statement. 40 C.F.R. § 1501.4(a). An

2. Plaintiffs have filed a number of declarations showing how these results of the Park Service's final agency action is having a direct and immediate impact on them. For example, members of plaintiff organizations have declared that their suggested plans to retain the lands under Park Service management as public recreation lands with minimal development have not, and very likely will not, receive any consideration now that the Park Service has transferred jurisdiction. *See, e.g.,* Declaration of Robert Boone ("Boone Decl.") ¶ 20; Declaration of Carolyn Serfass ¶¶ 12, 19. Others have indicated that because the Park Service performed no environmental analysis, they were deprived of the information necessary to keep their membership informed of potential threats to the land at issue and required to initiate and support legislation protecting Anacostia Park. *See, e.g.,* Declaration of Herbert Harris ¶ 36; Declaration of Judy Mannes ¶¶ 12–14; Declaration of Andrea Ferster ¶ 12. Members of plaintiff organizations also have stated that the development of the proposed for-profit theme park will severely reduce their use and enjoyment of Anacostia Park and surrounding areas. *See, e.g.,* Declaration of Dorn McGrath ¶¶ 14–18; Boone Decl. at ¶¶ 12–17.

agency action does not normally require an environmental impact statement if it falls within a categorical exclusion, which is defined as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4.

If an agency chooses not to prepare an environmental impact statement and does not invoke a categorical exclusion, the agency is required to prepare an environmental assessment to determine whether an environmental impact statement is necessary. 40 C.F.R. §§ 1501.3, 1501.4(a) & (b), 1508.9. Although not as detailed and thorough as an environmental impact statement, an environmental assessment requires the agency to carry out a preliminary environmental inquiry to determine whether the proposed action is a major activity having significant effects on the environment. If the agency determines that no environmental impact statement is required, it must report its decision in a "finding of no significant impact" ("FONSI"). 40 C.F.R. §§ 1501.4(e), 1508.13. If it determines that the proposed action does have a significant effect on the environment, it must then prepare an environmental impact statement. 40 C.F.R. § 1501.4.

 Because the undisputed facts cannot support the assertion that the transfer of jurisdiction had no significant environmental impact or was a mere paper transaction that did not change the status quo, the Court cannot conclude that the Park Service acted reasonably in preparing neither an environmental impact statement nor an environmental assessment.[3] NEPA and its regulations unambiguously require the preparation of either an environmental impact statement or an environmental assessment, followed by either a FONSI or an environmental impact statement, for all major federal actions that have not been categorically excluded. *Sierra Club v. Hodel*, 848 F.2d 1068, 1092–94 (10th Cir.1988). Any assertions that there are no significant impacts must be made in an environmental assessment and a FONSI after a preliminary environmental inquiry, not to a court after suit is filed. The Court may not substitute its own findings of no significant environmental impact on the basis of arguments of the parties, when the agency has failed to prepare an environmental assessment or FONSI in the first instance. *LaFlamme v. Federal Energy Regulatory Commission*, 852 F.2d 389, 399 (9th Cir.1988); *Sierra Club v. Hodel*, 848 F.2d at 1092–94.[4]

Nor is the Court persuaded that it would have been premature for the Park Service to comply with NEPA at the time jurisdiction was transferred to the District of Columbia. The transfer of jurisdiction was the "final agency action" to be taken by the National Park Service. Although development plans and their potential effects on the environment may be more certain later than at the time of transfer, the role of the Park Service will be strictly limited, if not non-existent, at that time. The Park Service has removed to the National Capital Planning Commission the primary federal responsibility for complying with NEPA as future developmental decisions made by the District of Columbia and the other parties to the lease become more definite. Record of Decision, A.R. 1401–02; Transfer of Jurisdiction, A.R. 1376–78. The Park Service will prepare no environmental evaluations when development

---

3. An agency's decision to forgo complying with the procedural requirements of NEPA is reviewed for reasonableness. *Goos v. ICC*, 911 F.2d 1283, 1292 (8th Cir.1990); *Conner v. Burford*, 836 F.2d 1521, 1526 (9th Cir.1988).

4. Whether an agency made the proper decision under NEPA to forgo preparing an environmental impact statement based on an environmental assessment and FONSI is subject to review under the arbitrary and capricious standard. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); *National Audubon Society v. Hester*, 801 F.2d 405, 407 (D.C.Cir.1986). Whether an agency can rely on an environmental assessment previously prepared for a related proposed action is also subject to review under the arbitrary and capricious standard. *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1429–33 (D.C.Cir.1985). Although the Park Service alluded in its briefs before the Court to prior environmental assessments covering proposed development in Anacostia Park, there is no evidence that it relied on the prior assessments in making its decision to transfer jurisdiction.

plans become more definite, will have no input on the future environmental analyses conducted by the NCPC, and has retained no authority to preclude development on the land. As Assistant Secretary of the Interior George T. Frampton, Jr., has acknowledged, "[t]his transfer of jurisdiction is complete" and "cannot be voided by the Department of the Interior;" the Park Service "does not retain authority concerning development in the transferred lands, over and above the restrictions placed in the transfer of jurisdiction document."[5]

Because there will be no subsequent Park Service decision for future NEPA analysis to inform, the time for the Park Service to have advised itself and the public of the environmental effects of and alternatives to its decision to transfer jurisdiction was at the time of transfer. The lease, together with the Transfer of Jurisdiction plat, show that there are specific potential uses of the properties that the Park Service could have analyzed for their environmental impact at the time it prepared its Record of Decision. A.R. 1401–02; A.R. 1376–78. The uncertain nature of an action's effects on the environment does not excuse an agency from NEPA analysis "before irrevocably committing to the activity," *Conner v. Burford*, 848 F.2d 1441, 1450 (9th Cir.1988), *cert. denied, Sun Exploration and Production Co. v. Lujan*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989), if the activity either "will or *may* have an effect on" the environment. 40 C.F.R. § 1508.3 (emphasis added). The Park Service was required to comply with NEPA before making its decision to transfer jurisdiction. The agency then had sufficient information regarding potential environmental effects and still retained a "maximum range of options" for the proposed activity. *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir.1983). Now it has no options. It has made its one and only decision as to this project; it is now "out of the loop."

### C. Compliance With NEPA By The National Capital Planning Commission Does Not Relieve The National Park Service From Its Own Statutory Responsibilities

The Park Service argues that the National Capital Planning Commission's past and future compliance with NEPA relieved it from itself having to comply with NEPA before it transferred jurisdiction. It maintains that the environmental assessment and FONSI prepared by the NCPC in December 1992 satisfy the Park Service's obligations under NEPA. It also argues that because the NCPC is obligated to prepare additional environmental assessments or environmental impact statements when development plans become more certain, and prior to commencement of any development activities that may significantly affect the environment, plaintiffs' concerns ultimately will be addressed.[6]

5. *See* Letter and Memorandum from George T. Frampton, Jr., Assistant Secretary of the Interior for Fish and Wildlife and Parks, to Representative Mike Synar 3, 4 (March 10, 1994), Plaintiff's Request For Judicial Notice, Exhibit B.

In a letter to the Secretary of the Interior, Representative Mike Synar, Chairman of the Subcommittee on Environment, Energy and Natural Resources of the House Government Operations Committee, asked the following questions: Does the Department or the Park Service (as opposed to the National Capital Planning Commission) have authority to review and approve or disapprove the actual design plans for this or any other development project on Kingman and Heritage Islands? Does the Department or the National Park Service (as opposed to the National Capital Planning Commission) retain any day-to-day authority over development activities on the transferred land? Letter from Representative Mike Synar to Secretary Bruce Babbitt (September 27, 1993), Plain-

tiff's Request For Judicial Notice, Exhibit A. In response, George T. Frampton, Jr., Assistant Secretary of the Interior for Fish and Wildlife and Parks, stated that no Park Service review or approval of design was required except for the location of bridges and peers and that the Park Service retains authority only to ensure that development does not violate the restrictions placed in the transfer of jurisdiction document. Frampton Letter at 4. The transfer of jurisdiction plat imposed such restrictions as limits on the height of structures, the amount of space that may be occupied by structures and the extent to which surfaces in the park may be paved. A.R. 1376.

6. Defendants note that the Transfer of Jurisdiction plat provides that "no modification to the landscape of the Property shall be made prior to completion of all environmental compliance required by Federal or District of Columbia law or regulation" and that "[a]ll development of the

Plaintiffs argue that the D.C. Circuit's recent decision in *Idaho v. ICC*, 35 F.3d 585 (D.C.Cir.1994), makes abundantly clear that an agency may not rely on the compliance of other agencies with NEPA as a justification for its failure to comply with the Act. In *Idaho v. ICC*, the court of appeals found that the ICC had failed to comply with NEPA when, without preparing an environmental impact statement, it authorized a salvage project by Union Pacific Railroad subject only to the condition that Union Pacific consult with other federal and state agencies about specific environmental impacts. *Idaho v. ICC*, 35 F.3d at 589–90, 595–96. The Court noted that "[i]nstead of taking its own hard look, the Commission deferred to the scrutiny of others," and held that "[a]n agency cannot delegate its NEPA responsibilities in this manner ..." *Idaho v. ICC*, 35 F.3d at 595 (*citing Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C.Cir.1971)). "[T]o rely entirely on the environmental judgments of other agencies [is] 'in fundamental conflict with the basic purpose' of [NEPA]": to require federal agencies to make an informed judgment of the balance between the economic and technical benefits of an action and its environmental costs. *Id.* (*quoting Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d at 1123).

Absent any countervailing considerations, the reasoning of *Idaho v. ICC* governs this case and requires the Park Service to take its own hard look at the potential effects that the transfer of jurisdiction may have on the environment by conducting an environmental assessment or preparing an environmental impact statement. *Idaho v. ICC*, 35 F.3d at 595–96; *see also North Carolina v. FAA*, 957 F.2d 1125, 1129–30 (4th Cir.1992); *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d at 1122–27. Indeed, the facts here are even more compelling than in *Idaho*. There the ICC retained some authority over the future activity that might affect the environment, the salvage operation, and argued that this

authority would provide it with a subsequent opportunity to address the environmental concerns. No such residual authority remains with the Park Service in this case. More importantly, the Court in *Idaho* found that the ICC's retention of residual authority and its ability to consider the environmental effects of future decisions is "no substitute for an overarching examination of environmental problems at the time" the ICC's initial decision was made. *Idaho v. ICC*, 35 F.3d at 596. If the ICC violated NEPA despite having retained some residual authority, then the National Park Service has certainly violated NEPA in this case, where it has retained no such authority.

Finally, the Court rejects defendants' argument that the unique role the National Capital Planning Commission plays in land use planning in the National Capital region distinguishes this case from *Idaho v. ICC*. In the National Capital Planning Act ("Planning Act"), Congress made the NCPC "the central Federal planning agency for the Federal Government in the National Capital" and expressly charged the NCPC with the duty "to preserve the historic and natural features thereof." 40 U.S.C. § 71a(a)(1). The Planning Act, however, does not allow, and certainly does not require (as defendants argue), the Park Service to delegate or defer its responsibilities under NEPA to the NCPC.

■ Agencies must comply with NEPA unless there is a "clear conflict of *statutory* authority." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d at 1115. There is no "clear conflict" between the Planning Act and NEPA. The two statutes are entirely compatible. Requiring the Park Service to comply with NEPA does not undermine the role of the NCPC. The NCPC retains its responsibilities with respect to decisions concerning Anacostia Park whether or not the Park Service complied with NEPA. Furthermore, if Congress had intended the Planning Act to exempt certain agency projects from NEPA

Property shall be subject to review and approval of the National Capital Planning Commission

and the Commission of Fine Arts." A.R. 8152.

compliance, it would have expressly said so in the statute, as it has in numerous other instances.[7] As the Third Circuit has held, "Congress intended that NEPA not be limited by other statutes by implication." *Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Commission,* 869 F.2d 719, 729 (3rd Cir.1989). The Court finds no intent by Congress that the National Capital Planning Act precludes application of NEPA.

*D. The National Park Service Never Adopted The Environmental Assessment Prepared By The National Capital Planning Commission*

▇ Although an agency may not avoid its NEPA obligations by simply relying on another agency's conclusions about a federal action's impact on the environment, the NEPA regulations do permit an agency in certain circumstances to adopt another agency's environmental impact statement or environmental assessment. 40 C.F.R. § 1506.3; *see North Carolina v. FAA,* 957 F.2d at 1129–30. The problem here is that there is no evidence that the National Park Service adopted the NCPC's environmental assessment. The undisputed facts show that it did not.

Section 1506.3 of the NEPA regulations specifically addresses the circumstances in which one agency may adopt an environmental impact statement issued by another agency. The provision also has been interpreted to allow an agency to adopt an environmental assessment that another federal agency has prepared, so long as the agency adopting the assessment reviews it and accepts responsibility for its scope and content. *North Carolina v. FAA,* 957 F.2d at 1130 (*citing Guidance Regarding NEPA Regulations,* Fed. Reg. 34,263, 34,265–66 (1983)). If the agency

adopts an environmental assessment, however, it must issue its own FONSI. *Id.*

Section 1506.3 considers three possible situations when adoption is appropriate. First, if an agency participated in the preparation of an environmental impact statement as a cooperating agency, it may adopt a final environmental impact statement of another agency after it has independently reviewed the environmental impact statement and determined that the lead agency's procedures satisfy its own NEPA procedures. 40 C.F.R. § 1506.3(c); *Guidance Regarding NEPA Regulations,* Fed.Reg. 34,265.[8] Second, if the agency was not a cooperating agency but is undertaking an activity that is substantially the same as one covered by another agency's earlier environmental impact statement, the agency may adopt the NCPC's environmental impact statement and recirculate it as a final environmental impact statement. 40 C.F.R. § 1506.3(b). In this situation, the agency must independently review the environmental impact statement to ascertain that it is current and that it satisfies the agency's own NEPA procedures. *Guidance Regarding NEPA Regulations,* 48 Fed.Reg. at 34,-265. Third, if the activity is not substantially the same as one covered by another agency's earlier environmental impact statement, the agency may adopt the environmental impact statement or a portion thereof by circulating it as a draft, or as a portion of the agency's draft, and then preparing a final environmental impact statement. *Id.;* 40 C.F.R. § 1506.3(a).

The National Park Service failed to properly adopt the environmental assessment of the National Capital Planning Commission. It did not designate the NCPC as the "lead agency," cooperate with it in the preparation of an environmental assessment, independently review the environmental assessment,

---

7. *See, e.g.,* 15 U.S.C. § 793(c) (Energy Supply and Environmental Coordination Act of 1974—siting and regulation of coal-burning powerplants does not require NEPA compliance); 45 U.S.C. § 791(c) (Regional Rail Reorganization Act of 1973—action before final date of railroad system plan does not require NEPA compliance); 15 U.S.C. § 719h(c)(3) (Alaska Natural Gas Transportation Act of 1976—Alaska Pipeline exempted from NEPA compliance).

8. If more than one federal agency is involved in the same action or in a group of related activities, a "lead agency" may be designated to supervise the preparation of an environmental impact statement. 40 C.F.R. § 1501.5. The involved agencies other than the lead agency assume the role of "cooperating agencies." 40 C.F.R. § 1501.6. A cooperating agency assists in the preparation of and reviews the lead agency's environmental impact statement. 40 C.F.R. § 1501.6.

determine that NCPC's procedures satisfied NEPA and the Park Service's own NEPA procedures, circulate a draft of the assessment, or adopt the environmental assessment as its own. It did none of these things. Indeed, there is no evidence that the National Park Service even considered the NCPC's environmental assessment and FONSI prior to its decision to transfer jurisdiction. The Record of Decision, the document setting out the Park Service's reasons for the transfer, demonstrates that the Park Service did not rely on the NCPC's environmental assessment or FONSI or on the environmental assessment or FONSI of any other agency. A.R. 1401–03. It merely makes the bald assertion that no environmental analysis was required by the Park Service before the transfer. A.R. 1402.

The Park Service's action "must be upheld, if at all, on the basis articulated by the agency itself" at the time of decision, not *post hoc* rationalizations. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *see Kansas City v. HUD,* 923 F.2d 188, 194 (D.C.Cir.1991). There is no evidence that the Park Service deferred to the NCPC or delegated its NEPA responsibilities to the NCPC or to any other agency in advance of its own final agency action to transfer. Nor did it observe the procedures required by NEPA to permit it to rely on the NCPC's environmental assessment and FONSI or did it in fact rely on the NCPC's documents regarding its environmental assessment. The Court therefore finds that the Park Service may not justify, *post hoc,* its decision not to prepare its own environmental assessment or environmental impact statement on the basis of the NCPC's preparation of an environmental assessment and FONSI in the past or on the basis of the NCPC's anticipated preparation of an environmental assessment or environmental impact statement as development plans become more specific.[9]

## E. *Must The Park Service Prepare An Environmental Impact Statement Or An Environmental Assessment?*

Plaintiffs argue that *Sierra Club v. Peterson,* 717 F.2d 1409 (D.C.Cir.1983), required the Park Service to prepare an environmental impact statement at the time it made the transfer because it was a "critical agency decision" that resulted in "irreversible and irretrievable commitments of resources" to an action affecting the environment. *Sierra Club v. Peterson,* 717 F.2d at 1414.

In *Sierra Club,* the court considered a challenge to a Forest Service decision to issue oil and gas leases in a Wilderness Study Area. The Forest Service had divided the leases into two categories: leases that included No Surface Occupancy ("NSO") stipulations for highly environmentally sensitive lands, and leases with standard stipulations for lands that were not environmentally sensitive. *Sierra Club v. Peterson,* 717 F.2d at 1411. The NSO stipulations required that the lessee submit site specific plans for exploration and development activities and allowed the Forest Service to preclude any activity on the leased land if it found the environmental impact would be significant. The standard stipulations also required site specific plans, but only permitted the Forest Service to require certain mitigating conditions to reduce environmental impacts; they did not reserve to the Forest Service the right to preclude the lessee's activities on the leased land. *Id.* The Forest Service prepared an environmental assessment, concluding that lease issuance, coupled with either the NSO or standard stipulations, would not result in significant adverse impacts to the environment. It therefore decided it did not need to prepare an environmental impact statement. *Id.*

The court of appeals reversed, holding that the lands leased without NSO stipulations did require an environmental impact statement. It based its decision on the agency's inability to preclude lessee activity under the standard lease stipulations and the agency's limited authority to control disturbances to

9. The Court does not need to decide, therefore, whether the NCPC's environmental assessment and FONSI were adequate under NEPA, but notes that plaintiffs present a strong argument that they were not.

the environment; it therefore concluded that the leasing stage was the point of irretrievable resource commitment. *Sierra Club v. Peterson,* 717 F.2d at 1414–15. The court held that an agency may delay preparation of an environmental impact statement only when it reserves "both the authority to *preclude* all activities pending submission of site-specific proposals and the authority to *prevent* proposed activities if the environmental consequences are unacceptable. If the Department chooses not to retain the authority to *preclude* all surface disturbing activities, then an EIS assessing the full environmental consequences ... must be prepared at the point of commitment ..." *Sierra Club v. Peterson,* 717 F.2d at 1415.

The Park Service did not retain authority to preclude activities on the leased Anacostia Park lands prior to submission of site-specific plans or the authority to prevent activities with significant environmental impacts. Its decision to transfer jurisdiction was for the purpose of permitting other parties to construct and operate the Children's Island theme park, which may significantly affect the environment. For the Park Service, this was the "critical agency decision." *Sierra Club v. Peterson,* 717 F.2d at 1414. Thus, it was required to evaluate the environmental impact of its decision *before* the transfer of jurisdiction.

The Court cannot conclude, however, that in the circumstances of this case *Sierra Club v. Peterson* necessarily requires the Park Service to prepare an environmental impact statement, as opposed to an environmental assessment, at this time. Without an environmental assessment and FONSI prepared by the Park Service that provides the Park Service's reasons for forgoing preparation of an environmental impact statement (if in fact that is the conclusion it reaches and believes it can justify in Court), it would be premature for this Court to require the Park Service to prepare an environmental impact statement.

## III. CONCLUSION

In passing NEPA, Congress sought to ensure "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts [and] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). Consequently, an agency must comply with NEPA "at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2. It must prepare an environmental impact statement "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5.

The Park Service violated NEPA by failing to undertake even the first and least burdensome step towards compliance, the preparation of an environmental assessment. The Park Service must at a minimum prepare an environmental assessment. Based on the assessment, the Park Service must either prepare a finding of no significant impact or, if it finds that the transfer of jurisdiction may significantly affect the environment, an environmental impact statement. Alternatively, the Park Service could forgo preparing an environmental assessment and proceed directly to the preparation of an environmental impact statement. At this late date, however, it may not invoke a categorical exclusion or adopt the NCPC's environmental assessment or FONSI. To do so now would amount to a *post hoc* rationalization of the Park Service's previous decision.[10]

For all of these reasons, plaintiffs' motion for summary judgment is hereby GRANT-

---

**10.** By requiring the Park Service to prepare an environmental assessment and a FONSI or an environmental impact statement, the Court is not elevating form over substance, as defendants argue. Rather, it is ensuring that the agency has considered the environmental effects of and al-

ternatives to a decision to transfer jurisdiction and that the public is informed of the environmental ramifications of the Park Service's actions and its rationale for its decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. at 349, 109 S.Ct. at 1845.

ED, and Defendants' motion is DENIED. An Order consistent with this Opinion is entered this same day.

SO ORDERED.

### ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment and Defendants' Motion For Summary Judgment and the responses thereto, and for the reasons stated in the Court's accompanying Opinion, the Court finds that there are no genuine issues as to any material facts and that plaintiffs are entitled to judgment as a matter of law. Accordingly, it is hereby

ORDERED that Plaintiffs' Motion For Summary Judgment is GRANTED and Defendant's Motion For Summary Judgment is DENIED; it is

FURTHER ORDERED that judgment is entered in Plaintiffs' favor; it is

DECLARED that Defendant's actions in transferring jurisdiction over portions of Anacostia Park to the District of Columbia to facilitate construction of the National Children's Island theme park without preparation of an Environmental Impact Statement or Environmental Assessment violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and its implementing regulations; and it is

FURTHER ORDERED that the National Park Service shall immediately comply with the National Environmental Policy Act in connection with the transfer of jurisdiction to the District of Columbia over Kingman and Heritage Islands. The Park Service must either prepare an environmental impact statement or an environmental assessment. If the Park Service chooses to prepare an environmental assessment it must also make either a finding of no significant impact or, if it finds that the transfer may significantly affect the environment, proceed with the preparation of an environmental impact statement.

The Court shall retain jurisdiction over this matter to facilitate prompt judicial review (a) if Defendants fail to comply with this Order and (b) if a change in the status quo with respect to the leased lands is threatened before the Defendants have fully complied with the National Environmental Policy Act.

SO ORDERED.