ISLAND DEVELOPMENT
CORPORATION,
Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 05–CV–1028.

District of Columbia Court of Appeals.

Argued Oct. 12, 2006.

Decided Oct. 4, 2007.

Richard J. Conway, with whom Scott Arnold and Austin M. Fulk, Washington, DC, were on the brief, for appellant.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee.

Before FARRELL and FISHER, Associate Judges, and KING, Senior Judge.

FISHER, Associate Judge:

The District of Columbia, National Children's Island, Inc. ("NCI"), and Island Development Corporation ("IDC") agreed to develop a recreational park on two islands in the Anacostia River. Several years later the deal fell apart, and the District of Columbia and IDC sued each other for breach of contract. Cross-motions were filed, and the Superior Court granted summary judgment to the District of Columbia, holding that a District Court ruling in an environmental lawsuit and a new federal law had frustrated the purpose of the contract and rendered performance impossible. We disagree, and we remand for further proceedings.

## I. Factual Background

### A. The 1993 Lease

In 1982, the District of Columbia and NCI signed a Cooperative Agreement which authorized NCI "to develop and operate a children's theme park" on Heritage Island and a portion of Kingman Island (the "Islands"), a forty-five acre site in the Anacostia River. Many years later, the District of Columbia entered into a Lease and Amended and Restated Cooperative Agreement with NCI and IDC to develop "a cultural, educational, and family-oriented recreation park" on the same site. This document, dated April 30, 1993, is the subject of this lawsuit and will be referred to as "the Lease" or "the 1993 Lease." According to the Lease, IDC is the "designated sublessee" of National Children's Island, Inc., responsible for the construction, development, and operation of the recreational park ("the Project").

By its terms, the Lease would not become effective unless two events occurred by September 1, 1993. First, the Council of the District of Columbia had to approve it. Second, because the Islands were owned by the United States of America, the National Park Service needed to transfer jurisdiction over them to the District of Columbia pursuant to 40 U.S.C. §§ 122, 123 (1988), presently codified at 40 U.S.C.

§ 8124 (2007).[1] These statutory provisions authorize the District of Columbia and the federal government to transfer to each other jurisdiction over property within the District of Columbia owned by one of them. *Id.* However, they allow transfer of jurisdiction "for purposes of administration and maintenance" only; the statutes do not provide for the transfer of title or the rights of development. *Id.*

## B. The Transfer of Jurisdiction

The National Park Service signed the Transfer of Jurisdiction in February 1993. The Council approved the Lease on July 13, 1993, and accepted the Transfer of Jurisdiction from the National Park Service on August 9, 1993.

The Transfer of Jurisdiction was subject to twelve conditions to which the District of Columbia agreed. The first condition mandated that the Islands "only be used for the purposes of constructing and operating a cultural, educational and family-oriented recreational park." The remaining conditions limited construction on, and use of, the Islands; some of them related to any environmental hazards created or discovered during the course of completing the park. Section 9 provided that

> [t]his transfer of jurisdiction will automatically revert to the United States Department of the Interior, National Park Service upon the passage of sixty (60) days from the date of written notice of reversion from said Department to the District of Columbia based on the occurrence of any of the following:
>
> (i) failure to commence [development of the recreation park] within 3 years of this transfer of jurisdiction;

> (ii) failure to commence operation of the Recreation Park ... within 5 years of this transfer of jurisdiction;
>
> (iii) after completion of construction and commencement of operation, the abandonment or non-use of the Recreation Park for a period of 2 years; or
>
> (iv) after completion of construction, and commencement of operation, conversion of the Property to a use other than that specified in [this transfer of jurisdiction], or conversion to a parking use not in accord with the provisions of [this transfer of jurisdiction].

The 1993 Lease specifically referred to this portion of the Transfer of Jurisdiction: "This [Lease] shall automatically terminate upon (i) the occurrence of any event of reversion described in Section 9 of [the Transfer of Jurisdiction] and (ii) the actual reversion of jurisdiction over the [Islands] from the District to the National Park Service...."

## C. The *Watershed* Case

After the Transfer of Jurisdiction was completed, several environmental groups, including the Anacostia Watershed Society, sued the National Park Service and others, alleging that the transfer violated the National Environmental Policy Act ("NEPA").[2] *See Anacostia Watershed Society v. Babbitt,* 871 F.Supp. 475, 478 (D.D.C.1994) (*"Watershed I"*). They sought a declaration that the transfer violated NEPA and an order rescinding the transfer. *Id.* at 478. On December 9, 1994, the United States District Court for the District of Columbia declared that the National Park Service had violated NEPA and ordered it to "immediately comply" by preparing an environmental impact statement or performing an environmental as-

---

1. These statutes are also codified as D.C.Code §§ 10–111 and 10–112 (2001), *formerly* D.C.Code §§ 8–111 and 8–112 (1981).

2. 42 U.S.C. § 4321 *et seq.*

sessment of the effects of the Transfer of Jurisdiction. *Id.* at 488. The court retained jurisdiction over the matter "to facilitate prompt judicial review" if the National Park Service did not comply with the court's order and "if a change in the status quo with respect to the leased lands is threatened before the [National Park Service] ha[s] fully complied with the National Environmental Policy Act." *Id.*

The plaintiffs moved the court to "clarify or amend" its order "by setting aside as void *ab initio* the transfer of jurisdiction...." *Anacostia Watershed Society v. Babbitt,* 875 F.Supp. 1, 1 (D.D.C.1995) ("*Watershed II* "). However, the court "decline[d] to rescind the transfer...." So far as the evidence revealed, the National Park Service could "preserve the status quo pending full compliance with NEPA...." *Id.* at 2.

Other problems developed because the federal government retained ownership of the Islands. For example, no buildings or structures could be built on federally owned land within the District of Columbia "without express authority of Congress," D.C.Code § 10–128 (2001), so IDC could not obtain financing or begin construction.

## D. The National Children's Island Act

Responding to the difficulties created by overlapping federal and District regulations, the parties worked together to petition for Congressional action. In April 1995, Delegate Eleanor Holmes Norton introduced H.R. 1508, the National Children's Island Act of 1995 ("NCI Act"), "at the request of the District of Columbia." 141 CONG. REC. H11389 (1995) (statement of Del. Norton). The legislation would transfer ownership of the Islands from the federal government to the District of Columbia "[i]n order to facilitate the construction, development, and operation of National Children's Island...." National Children's Island Act of 1995, Pub.L. No. 104–163, § 3(a), 110 Stat. 1416, 1416 (1996). Both NCI and the District of Columbia sent representatives to the Congressional hearing to testify in support of the bill. *See National Children's Island Act of 1995: Hearing on H.R. 1508 Before the Subcomm. on National Parks, Forests and Lands of the H. Comm. on Resources,* 104th Cong. (1995) (statements of Carroll B. Harvey, Chairman of the Planning Committee for National Children's Island, Inc., and Michael A. Rogers, City Administrator for the District of Columbia). The bill was enacted as the National Children's Island Act of 1995, Public Law Number 104–163, on July 19, 1996.

The Act required the Secretary of the Interior, no later than six months after enactment, to transfer to the District by quitclaim deed "all right, title, and interest of the United States in and to the Islands." *Id.,* § 3(a). The law also imposed some conditions on the transfer, including a "reversion" provision similar to the one in Transfer of Jurisdiction:

The transfer under subsection (a) ... shall be subject to the condition that the Islands only be used for the purposes of National Children's Island. Title in the property transferred ... shall revert to the United States 60 days after the date on which the Secretary provides written notice of the reversion to the District based on the ... determination ... that one of the following has occurred:

(A) Failure to commence improvements in the recreational park within the earlier of—

(i) three years after building permits are obtained for construction of such improvements; or

(ii) four years after title has been transferred, as provided in subsection (a).

(B) Failure to commence operation of the recreation park within the earlier of—

 (i) five years after building permits are obtained for construction of such improvements; or

 (ii) seven years after title has been transferred, as provided in subsection (a).

(C) After completion of construction and commencement of operation, the abandonment or non-use of the recreation park for a period of two years.

(D) After completion of construction and commencement of operation, conversion of the Islands to a use other than that specified in this Act or conversion to a parking use not in accordance with [the Act].

*Id.* at § 3(d), 110 Stat. at 1417–18. The District was required to carry out its review of the project "in full compliance with all applicable provisions of" NEPA. *Id.* at § 4(c), 110 Stat. at 1418–19. Finally, § 5 of the Act states: "Upon the transfer of the Islands to the District pursuant to this Act: (1) The Transfer of Jurisdiction concerning the Islands from the National Park Service to the District dated February 1993 ... shall become null and void and of no further force and effect...." *Id.* at § 5(a)(1), 110 Stat. at 1419.

Pursuant to § 3(a) of the NCI Act, the Secretary of the Interior transferred title to Heritage Island and the affected portion of Kingman Island to the District of Columbia via quitclaim deed on January 16, 1997. The text of the deed reiterates the pertinent conditions on that transfer mandated by the NCI Act, including the reversion provisions and NEPA requirement discussed above.

### E. Changing Priorities

After the NCI Act became effective in July 1996, and anticipating the transfer of title to the Islands within the next six months, IDC and the District of Columbia began to renegotiate the Lease. On July 25, 1996, IDC tendered to the District a draft amended lease. Its cover letter stated, "[T]he Original Lease was based on the [Transfer of Jurisdiction]. Now, with the enactment of the NCI Act, the Original Lease must be amended to conform to the new NCI Act and otherwise to reflect the current situation." After many letters back and forth, with both parties proposing changes to the 1993 Lease, the District and IDC agreed on a revised lease in September 1997.

The Council of the District of Columbia approved the revised lease on December 16, 1997. D.C. Council Resolution 12–336, 44 D.C.Reg. 7749 (1997). It then was submitted for approval by the District of Columbia Financial Responsibility and Management Assistance Authority (the "Control Board"), because 1997 was a "control year" for the District.[3] After a lengthy period of review, the Control Board rejected the revised lease on March 5, 1999, because it was "not consistent with the financial plan and budget nor in the interests of the District."

---

**3.** Congress established the Control Board by enacting the District of Columbia Financial Responsibility and Management Assistance Act of 1995. Pub.L. No. 104–8, 109 Stat. 97 (1995), *codified at* D.C.Code § 47–391.01 *et seq.* (2001). The purpose of this act was to eliminate budget deficits and management inefficiencies in the District of Columbia government. Pub.L. No. 104–8, § 2(b). If the Mayor or the Council of the District of Columbia proposed that the District enter into certain contracts or leases during designated "control years," the act required that the contract or lease first be submitted to the Control Board for approval. *Id.* at § 203(b).1997 was a "control year," but 1993 was not. *See id.* at § 305(4); D.C.Code § 47–393(4) (2001) (defining "control year").

On August 18, 1998, while the parties to the revised lease were awaiting a final decision, Mayor Barry wrote to the Chairman of the Control Board stressing "the need for immediate favorable action...." The Mayor stated that after two legal reviews of the status of the 1993 Lease, "[t]he resulting assumption is that the [1993] lease remains in effect, even if the [revised] lease is not approved by the [Control Board]." When the Control Board made its decision to reject the revised lease, a member of its staff stated for the record that "[t]he original lease is dated April of 1993, and it will remain—this resolution and order of the board will not affect that lease." However, her next sentence reports that "[t]here is a serious question whether that lease is now in effect or at least if the developer is not in default under the lease."

On May 10, 1999, soon after the revised lease was rejected (and after Marion Barry had left office), the District entered into an agreement with Maryland officials regarding environmental cleanup of the Anacostia River Basin. Although the goals of the agreement are broadly stated, it anticipates the restoration and creation of wetlands and other measures that are inconsistent with development of the Islands. District officials recognized that this agreement would preclude the Project from going forward.

On June 7, 1999, the District of Columbia notified NCI and IDC that the 1993 Lease "ha[d] been terminated as of January 16, 1997. The Lease was terminated on that date upon the signing of the quitclaim deed...." The letter also claimed that even if the quitclaim deed had not terminated the Lease, NCI and IDC were in default under the terms of the Lease. The District sent another letter on September 8, 1999, insisting that NCI and IDC "quit and surrender possession of" the Islands "no later than thirty (30) days after receipt of this notice to quit." The notice to quit was based on IDC's asserted "failure to cure" the "events of default" named in the June 7 letter. On October 7, 1999, IDC vacated the Islands under protest, and it filed this lawsuit on the same day.

## II. Procedural History

Island Development Corporation alleged that the District of Columbia had breached and repudiated the Lease and had taken its property without just compensation. The District of Columbia filed a counterclaim accusing IDC of breaching the Lease. On February 16, 2001, IDC moved the court to enter partial summary judgment holding (1) that the District breached the agreement when it declared that the signing of the quitclaim deed had terminated the Lease, and (2) that an uncompensated taking had occurred. The District of Columbia filed a cross-motion for summary judgment arguing that: the Lease was void because a condition precedent was never satisfied; to the extent the Lease was not void, it was terminated by IDC's breach and failure to cure; IDC's surrender of the Islands extinguished all its rights under the Lease; and IDC's claim for lost profits was too speculative. On August 1, 2002, the District filed a "supplemental memorandum" arguing that the *Watershed* litigation and the NCI Act were supervening events that frustrated the purpose of the Lease or made it impossible to perform.

On July 27, 2005, the Superior Court granted summary judgment to the District of Columbia, holding that the *Watershed* decisions and the NCI Act were "supervening events [that] frustrated the purpose of the lease and made performance impossible." Relying on the RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981) and our decision in *Whelan v. Griffith Consumers*

*Co.,* 170 A.2d 229, 230 (D.C.1961), the court was "satisfied that the District Court's decision was such a supervening event that frustrated the purpose of the lease. Indeed, it made performance under the lease impossible.... The [*Watershed*] court maintained the status quo and prevented an[y] activity in furtherance of the Transfer of Jurisdiction until compliance with NEPA."

Furthermore, the Superior Court explained,

> [w]ith the conveyance of the quitclaim deed and the voiding of the Transfer of Jurisdiction, ... many of the[ ] provisions of the lease make little sense. For example, the lease states that it is subject and subordinate to the Jurisdiction Agreement. Moreover, the Jurisdiction Agreement imposed performance obligations on the part of both the District and Island Development and set timetables for the performance of many of Island Development's obligations under the lease. The parties clearly did not contemplate a lease agreement with critical obligations being rendered meaningless and unenforceable.

In sum, "[t]he court [was] satisfied that when the parties entered into the 1993 lease agreement, they did not contemplate that critical portions of the agreement would be voided by a District Court's decision and an Act of Congress.... Under the circumstances, neither party is at fault and the lease is unenforceable." The court denied IDC's motion for partial summary judgment, and this appeal followed.

### III. Standard of Review

■ "We review the trial court's grant of summary judgment *de novo,* making our own independent inquiry to determine whether the trial court correctly concluded that the movant was entitled to judgment." *Copeland v. Cohen,* 905 A.2d 144, 146 (D.C.2006). "Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation and editing omitted).

■ "[L]eases of real property are to be construed as contracts. This jurisdiction adheres to an 'objective' law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties unless the written language is not susceptible of a clear and definite undertaking." *Sobelsohn v. American Rental Management Co.,* 926 A.2d 713, 718 (D.C. 2007) (internal citations, quotations, and editing omitted).

### IV. The 1993 Lease Did Not Terminate According To Its Own Terms

The District of Columbia argues that the Lease terminated by its own terms because the *Watershed* decisions declared that the Transfer of Jurisdiction violated NEPA and the NCI Act declared the Transfer null and void. Although the District made this argument in the trial court and it was fully debated during summary judgment proceedings, the court's decision does not rely on it. Nevertheless, we address this argument first, because if the Lease terminated by its own terms, we will not need to resolve the more difficult issues of frustration and impossibility.

■ Section A of the Lease provides that "[i]n the event that ... the Jurisdiction Transfer has not occurred ... by September 1, 1993, ... upon written notice from ... the District of Columbia ... to the other parties hereto, this [Lease] shall terminate and be of no further force or effect...." The District maintains that the letters it sent to IDC on June 7 and

September 8, 1999, constituted this written notice, so the Lease terminated by its own terms "without breach on the part of any party."

Under the language quoted, however, the notice would serve to terminate the Lease only if the Transfer of Jurisdiction had not occurred by September 1, 1993. The National Park Service signed the transfer of jurisdiction in February 1993, the Council of the District of Columbia approved it on August 9, 1993, and the National Capital Planning Commission signed it on August 10. Therefore, the Transfer of Jurisdiction "occurred" before September 1, 1993.

Nevertheless, the District of Columbia argues that the 1993 Lease contemplated a lawful transfer and that "this essential condition was not satisfied because the transfer of jurisdiction was not legally effective." It emphasizes that the Transfer of Jurisdiction "was the basis of the bargain" because, without it, the District "lacked the power to authorize Island Development to do anything on the Islands." According to the District, the Transfer was nullified by the *Watershed* decisions and by the NCI Act. (It is interesting to note that the District's letters declaring that the Lease had terminated do not mention the *Watershed* decisions at all. Moreover, the District does not explain why it took nearly two and one-half years to recognize that the event mentioned in those letters— the signing of the quitclaim deed—had had a fatal impact on the Lease.)

The District's argument is directly at odds with the *Watershed* decisions themselves. The District Court held that the National Park Service had violated NEPA,

see *Watershed I*, 871 F.Supp. at 488, but it did not declare the transfer unlawful. Indeed, the court allowed the Transfer to remain in effect, choosing instead to preserve the *status quo* while the Park Service worked to comply with NEPA. *Watershed II*, 875 F.Supp. at 1, 2. Similarly, although section 5 of the NCI Act provided that the Transfer of Jurisdiction "shall become null and void," that would happen "[u]pon the transfer of the Islands to the District pursuant to this Act...." Replacing the Transfer of Jurisdiction for purposes of administration and maintenance with the more potent transfer by quitclaim deed did not nullify any "essential condition" of the 1993 Lease. As the District of Columbia admits, the Transfer of Jurisdiction was a condition precedent to the Lease because without it the District would have lacked authority "to authorize Island Development to do anything on the Islands." In other words, it was important because it provided the District the authority to pursue the NCI project. The NCI Act did not strip the District of that power in any sense; rather, it markedly enhanced the District's authority over the Islands. After the quitclaim deed was signed, the Transfer of Jurisdiction became superfluous.[4] Contrary to the District's argument, the Lease did not terminate according to its own terms.[5]

## V. The Doctrines of Frustration of Purpose and Impossibility

 The trial court held that the *Watershed* decisions and the passage of the NCI Act frustrated the purpose of the lease and made it impossible to perform. "It is well settled that when, due to circumstances beyond the control of the parties the per-

---

4. The legislative history of the NCI Act does not explain why Congress chose to declare the Transfer of Jurisdiction "null and void."

5. Had the 1997 revised lease become effective, it would have superseded the 1993 Lease, but the parties agree that the revised lease never took effect because it was rejected by the Control Board.

formance of a contract is rendered impossible, the party failing to perform is exonerated." *Whelan*, 170 A.2d at 230. We have also recognized the related, but distinct, doctrine of frustration of purpose. *Id.* Both doctrines operate to nullify a contract, but for different reasons.

## A. General Principles

"In American courts, frustration of purpose is distinguished from impossibility or impracticability of performance, though the doctrines are closely related. Frustration of one party's purpose is not usually caused by an impossibility or even difficulty in performance. In the typical scenario, the party is perfectly capable of performing ..., but the party's reason for doing so [no] longer exists. Nevertheless, courts are not always careful to distinguish between frustration, impossibility, and impracticability. The confusion is understandable because the governing rules are quite similar." 14 James P. Nehf, Corbin on Contracts: Impossibility § 77.1, at 243 (Joseph M. Perillo ed., 2001) (footnotes omitted).

The Restatement (Second) of Contracts discusses these governing rules, defining the doctrine of frustration in section 265: "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts: Discharge by Supervening Frustration § 265 (1981). The description of impossibility or impracticability is almost the same: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a

basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts: Discharge by Supervening Impracticability § 261 (1981). The Restatement uses the word "impracticability" rather than the common-law term "impossibility," *see id.*, § 261 cmt. d ("the rule stated in this Section is sometimes phrased in terms of 'impossibility' "), but the two concepts are sufficiently similar that we need not distinguish between them for purposes of resolving this case.

"Although frustration and commercial impracticability are related, they deal with two different effects that unforeseen circumstances may have on performance. Under the frustration defense, the promisor's performance is excused because changed conditions have rendered the performance bargained from the promisee worthless, not because the promissor's performance has become different or impracticable. On the other hand, commercial impracticability excuses a promissor from performance because a supervening event changes the nature of the promissor's performance so that it has become commercially impracticable. Under frustration analysis the court is concerned with the impact of the event upon the failure of consideration, while under impracticability, the concern is more with the nature of the event and its effect upon performance." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1296 (Fed.Cir.2002) (citation omitted). *See also United States v. Bunner*, 134 F.3d 1000, 1004 (10th Cir. 1998) ("Although the supervening event does not render performance impossible, one party's performance becomes virtually worthless to the other."); *Fredette v. Allied Van Lines, Inc.*, 66 F.3d 369, 373 (1st Cir.1995) ("although performance remains

possible[,] the expected value of performance to the party seeking to be excused has been destroyed by the fortuitous event") (internal quotation marks, editing, and citation omitted).

The courts of this jurisdiction have not often applied the doctrine of frustration, but comment a to RESTATEMENT section 265 explains its elements: "First, the purpose that is frustrated must have been a principal purpose of that party in making the contract.... The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial.... The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made." A party must show all three of these elements in order to excuse performance of the contract under the doctrine of frustration. *Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56, 69 (S.D.2002); *Mel Frank Tool & Supply, Inc. v. DiChem Co.*, 580 N.W.2d 802, 806 (Iowa 1998).

A similar analysis determines whether an event caused performance of a contract to become impossible. "First, a contingency—something unexpected—must have occurred. Second, the risk of the unexpected occurrence must not have been allocated either by agreement or by custom. Finally, occurrence of the contingency must have rendered performance commercially impracticable. Unless the court finds these three requirements satisfied, the plea of impossibility must fail." *Transatlantic Financing Corp. v. United States*, 124 U.S.App. D.C. 183, 186–87, 363 F.2d 312, 315–16 (1966) (footnote omitted). *See National Association of Postmasters*

*of the United States v. Hyatt Regency Washington*, 894 A.2d 471, 477 n. 5 (D.C. 2006) (citing *Transatlantic*); *Duffy v. Duffy*, 881 A.2d 630, 639 (D.C.2005) (recognizing the doctrine of commercial impracticability).

The doctrines of frustration of purpose and impossibility will relieve a party of his obligations under a contract only in extreme circumstances. In *Bergman v. Parker*, we explained: "It is true that when the performance of an agreement is rendered impossible due to circumstances beyond the control of the parties, the party failing to perform is exonerated. Such impossibility is not limited to absolute or legal impossibility and includes impracticability due to extreme or unreasonable difficulty. However, it must be a real impossibility and not a mere inconvenience or unexpected difficulty." 216 A.2d 581, 583 (D.C.1966) (footnotes omitted; refusing to hold that performance under contract was impossible due to inability to obtain building permits when "[t]here [was] no question that building permits could have been issued after modification of existing plans ...."); *accord, Transatlantic Financing Corp.*, 124 U.S.App. D.C. at 190, 363 F.2d at 319 (holding that the closure of the Suez Canal due to international conflict did not render a shipping contract impossible when an alternative route around the Cape of Good Hope was available); *see* RESTATEMENT § 261, cmt. d ("[A] party is expected to use reasonable efforts to surmount obstacles to performance ..., and a performance is impracticable only if it is so in spite of such efforts.").

## B. The *Watershed* Decisions Did Not Frustrate the Purpose of the Lease or Make It Impossible to Perform

The District of Columbia has not explained how the *Watershed* requirement

that the National Park Service comply with NEPA rendered IDC's performance under the contract worthless. So far as the record discloses, the requirements of the *Watershed* decision could have been met, and the Project could have been completed, conferring the desired benefit on the District. Indeed, the District did not behave as if the hurdles erected by *Watershed I* had made development of National Children's Island worthless. It worked for passage of the NCI Act (which, for all practical purposes, made the *Watershed* decisions irrelevant), it negotiated the 1997 lease, and it urged the Control Board to approve the revised lease, stressing the importance of the Project. The District's priorities may have changed in later years, but the purpose served by signing the Lease was not frustrated by the *Watershed* decisions.

The Superior Court held that the District Court decisions made performance under the Lease impossible because "it is clear that upon the issuance of the *Watershed* decision, [IDC] could not exercise [its] rights [under the Lease]. *Watershed* rendered the rights of all parties to the lease ineffective by precluding any development activities on the island properties until the National Park Service complied with NEPA." As we have demonstrated, however, the *Watershed* decisions did not preclude completion of the Project; rather, they added another step to the process— complying with NEPA. This additional step certainly was an "inconvenience or unexpected difficulty," *see Bergman,* 216 A.2d at 583, and the *Watershed* decisions probably delayed the Project, but they did not make it impossible (or even impracticable) to complete it.[6]

### C. The NCI Act Did Not Frustrate the Purpose of the Lease[7]

The District of Columbia argues that by nullifying the Transfer of Jurisdiction, the NCI Act eliminated essential terms of the Lease. Section 5(a)(1) of the National Children's Island Act provides, "Upon the transfer of the Islands to the District pursuant to this Act: (1) The Transfer of Jurisdiction concerning the Islands from the National Park Service to the District dated February 1993 ... shall become null and void and of no further force and effect...." Pub.L. No. 104–163, § 5(a)(1), 110 Stat. 1416, 1419 (July 19, 1996). The transfer of title to the Islands to the District occurred when the quitclaim deed was

---

6. A brief review of NEPA case law reinforces the conclusion that compliance with NEPA was (at least so far as this record discloses) merely an added step necessary for completion of the contract; it did not render performance impossible. NEPA is a procedural requirement that federal agencies complete environmental analyses. It does not mandate particular results based on those assessments. *See, e.g., Environmental Defense Fund, Inc. v. Massey,* 300 U.S.App. D.C. 65, 69, 986 F.2d 528, 532 (1993) ("NEPA, unlike many environmental statutes, does not dictate agency policy or determine the fate of contemplated action. NEPA simply mandates a particular process that must be followed by a federal agency before taking action significantly affecting the human environment. After weighing environmental considerations, an agency decisionmaker remains free to subordinate the environmental concerns revealed in the [Environmental Impact Study] to other policy concerns." (citations omitted)).

7. Because the District of Columbia actively lobbied for passage of the NCI Act, it arguably is in no position to invoke the doctrines of frustration and impossibility. *See* Restatement § 265 ("Where ... a party's principal purpose is substantially frustrated without his fault...."); Restatement § 261 ("Where ... a party's performance is made impracticable without his fault ..."). In this section of our opinion, and the next, we assume, without deciding, that the District may be heard to claim that the NCI Act frustrated the purpose of the Lease or rendered performance impossible.

executed January 16, 1997. On that date, the District contends, "the predicate and foundation of the 1993 Lease was gone.... [S]upervening events had outrun the 1993 Lease."

The trial court agreed, listing the following provisions in the Lease which referred to the Transfer of Jurisdiction: section 1(b) states that the Lease is "subject and subordinate to" the Transfer of Jurisdiction; section 3(a) references the performance obligations the Transfer of Jurisdiction imposes on the District and IDC; and section 8 refers to the timetables set by the Transfer of Jurisdiction for the completion of those obligations. Also, sections 8 and 11 (a, b) of the Lease cross-reference the reversion provisions listed in section 9 of the Transfer of Jurisdiction. According to the trial court, "[t]he parties clearly did not contemplate a lease agreement with critical obligations being rendered meaningless and unenforceable." It concluded that voiding these portions of the agreement "frustrated the purpose of the lease and made performance impossible."

We disagree. The fact that the parties did not foresee supervening events does not mean that their purpose has been frustrated or that performance is impossible. A party demonstrates that an event "substantially frustrated" the purpose of a contract by showing that "changed conditions have rendered the performance bargained from the promissee worthless, not because the promissor's performance has become different or impracticable." Seaboard Lumber Co., 308 F.3d at 1296; accord, La Gloria Oil & Gas Co. v. United States, 72 Fed.Cl. 544, 573 (2006) ("Frustration of purpose is a defense to excuse performance on the basis of changed conditions that have rendered the performance worthless to one of the parties." (internal quotation marks, editing, and citation omitted)). The purpose of the Lease was "to construct, develop, use and operate the [Islands] as [ ] a cultural, educational and family-oriented recreational park...." The NCI Act's purpose was "to facilitate the construction, development, and operation" of "a cultural, educational, and family-oriented recreation park...." Pub.L. No. 104–163, § 3(a), § 2(4), 110 Stat. 1416, 1416 (1996). The District has not supported its illogical argument that this law, enacted to facilitate performance of the contract, instead substantially frustrated its purpose.[8]

The trial court held that by voiding the Transfer of Jurisdiction, the NCI Act ren-

**8.** The legislation was intended to facilitate the completion of the Project, not hinder it. When the Transfer of Jurisdiction proved inadequate, the parties asked Congress to give them the authority necessary to complete the Project. The legislative history shows that this is exactly what Congress intended to do, and that is what the text of the law accomplishes. The members of the House who spoke about the proposed legislation praised it for enabling the District of Columbia to complete the National Children's Island project after it had been stymied by less efficient arrangements with federal authority. 141 CONG. REC. H11388–89 (1995) (statements of Del. Norton, Rep. Richardson, & Rep. Davis). The Senate report recognized this concern as well: "Eliminating a duplicative layer of management and accompanying paperwork is intended to streamline the process [of developing the Islands] and avoid additional delays." S.REP. No. 104–294, at 7 (1996).

Congress did state that the NCI Act was not to be construed "as an express or implied endorsement or approval by the Congress of any such construction, development, or operation of National Children's Island." Pub.L. No. 104–163, § 6(1), 110 Stat. 1420. However, this comment does not express disapproval, and it certainly does not amount to frustration or impossibility. As the Senate report explained, "[i]t is not the role of Congress to usurp the decision-making processes of the local government." S.REP. No. 104–294, at § 6.

dered critical terms of the 1993 Lease "meaningless." While the Lease did reference the Transfer of Jurisdiction many times, these terms were not simply erased when the Transfer of Jurisdiction was voided. The instrument that voided the Transfer replaced those "critical terms" with its own substantially equivalent provisions. The NCI Act contained provisions regarding all of the terms mentioned by the trial court that were previously contained in the Transfer, namely IDC's performance obligations and the circumstances in which the Islands would revert back to the federal government. Thus, the parties had ample guidance for performing under the Lease.[9]

The parties certainly encountered unforeseen difficulties while trying to develop National Children's Island, and various adjustments were required. However, passage of the NCI Act did not frustrate the purpose of the Lease.

### D. The NCI Act Did Not Render Performance of the Lease Impossible

▮ As we have discussed, in order for a plea of impossibility to succeed, the "occurrence of the [supervening event] must have rendered performance commercially impracticable." *Transatlantic Financing*

*Corp.,* 124 U.S.App. D.C. at 186–87, 363 F.2d at 315–16 (footnote omitted). A change in law can sometimes have this effect on a contract. *See, e.g., Wm. P. Lipscomb Co. v. Kaldenbach & Wysong, Inc.,* 187 A.2d 124, 126 (D.C.1962) (footnote omitted) ("When a contract cannot be fully performed because prevented or prohibited by an intervening governmental act, or municipal regulation, or an administrative order, the promissor's duty may be discharged."). However, "impossibility of performance is a defense that must be proved." *Id.* A supervening event that discharges a contract due to impossibility "must be a real impossibility and not a mere inconvenience or unexpected difficulty." *Bergman,* 216 A.2d at 583 (refusing to hold that contract was impossible due to inability to obtain building permits, when "[t]here [was] no question that building permits could have been issued after modification of existing plans ...." (footnote omitted)). As explained above, the NCI Act did not render the Lease meaningless, and its provisions mimicked the provisions it replaced in the Transfer of Jurisdiction. The parties were as able to perform their obligations under the Lease after the NCI Act as before. Performance certainly had not become impossible or impracticable.[10]

---

9. For example, the NCI Act states that "development of the National Children's Island shall proceed as specified in paragraph 3 of the legend on the plat," Pub.L. No. 104–163, § 3(c), 110 Stat. at 1417, a document that was created as part of the District of Columbia's approval of the Lease. *See* D.C. Act 10–110, § 2(a), 40 D.C.Reg. 7227 (1993). Section 4(c) of the Act states that "the final design plans for the recreation park ... are subject to the review and approval ... of the District of Columbia in accordance with the Children's Island Development Plan Act of 1993 (D.C. Act 10–110)." Pub.L. No. 104–163, § 4(c), 110 Stat. at 1418. This was the Act passed by the Council of the District of Columbia endorsing the 1993 Lease. D.C. Act 10–110, 40 D.C.Reg. 7227 (1993). Fur-

thermore, as discussed above, events of reversion and a timetable for development are incorporated in the quitclaim deed.

10. The District of Columbia cites *Jonathan Woodner Co. v. Laufer,* 531 A.2d 280 (D.C. 1987), as the "closest case" in our jurisdiction "on the facts." However, our decision in that case focused on the propriety of a quantum meruit award and sheds no light on the issues presented here. In *Woodner* the District of Columbia Department of Housing and Community Development concluded that a new law barred further consideration of the contracting parties' applications to convert rental apartments they were renovating into condominiums. 531 A.2d at 284. The trial court ruled that the contract had been "dis-

## VI. Conclusion

Neither the *Watershed* decisions nor the NCI Act rendered performance of the 1993 Lease impossible or frustrated its purpose. Additionally, neither event caused the Lease to terminate on its own terms. We therefore reverse the judgment of the Superior Court.

The Islands are now incorporated in the effort to clean up the Anacostia River, and IDC acknowledges that National Children's Island will not be developed. Future litigation will focus, in large part, on whether IDC is entitled to damages. The trial court's decision made no findings about whether either side had committed a breach of the Lease. Similarly, it did not address IDC's alternative claim that its property has been taken without just compensation. Because these issues turn upon the resolution of factual questions, we are not in a position to address them in the first instance. We therefore remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

charged by a supervening impossibility," but that ruling was not contested on appeal. *Id.* at 284, 286. Even the factual comparison to *Woodner* is inapt. The NCI Act did not do anything to make performance of the Lease impossible; in fact, it facilitated development of the recreational park.