**BASEL ACTION NETWORK,**
et al., Plaintiffs,

v.

**MARITIME ADMINISTRATION,**
et al., Defendants.

**Civ.A. No. 03–2000(RMC).**

United States District Court,
District of Columbia.

Oct. 2, 2003.

J. Martin Wagner, Oakland, CA, for plaintiffs.

Brian Christopher Toth, U.S. Department of Justice, Environment & Natural Resources, General Litigation Section, Washington, DC, for defendants.

## TEMPORARY RESTRAINING ORDER

COLLYER, District Judge.

On September 26, 2003, Plaintiffs filed a motion for a temporary restraining order ("TRO") to enjoin Defendants from exporting ships listed in the National Defense Reserve Fleet's ("NDRF") non-retention category, including the Canisteo and the Caloosahatchee, until the Court has ruled on Plaintiffs' motion for a preliminary injunction. The Court heard oral argument on this matter on October 1, 2003, at which time Defendants submitted an opposition brief with exhibits.

At issue is Defendant Maritime Administration's ("MARAD") decision to export 13 defunct naval vessels from the James River in Virginia to the United Kingdom for disposal in conjunction with an export "Pilot Program" established by Congress in the Bob Stump National Defense Authorization Act ("NDAA") for Fiscal Year 2003, Pub.L. No. 107–314, § 3501, 116 Stat. 2458 (2002). The Canisteo and Caloosahatchee—built in the mid–1940s and presently in dangerously deteriorating condition—are slated to leave Virginia as soon as October 3, 2003.[1] Plaintiffs note that MARAD has informed officials in the

---

1. MARAD originally intended to export two ships on September 30, 2003. Following the filing of the instant TRO motion, the agency agreed to postpone this action until October 3, 2003, in order to give defense counsel an opportunity to prepare an adequate response.

United Kingdom that the 13 ships contain up to 100 tons of polychlorinated biphenyls ("PCBs"), as well as significant quantities of asbestos and fuel oil. MARAD plans to tow the ships in tandem across the North Atlantic to Teesside, England, where AbleUK, a British shipbreaker, will dismantle them and dispose of the hazardous materials.

Plaintiffs claim that MARAD's export plan violates three statutes, giving rise to a cause of action under the Administrative Procedure Act ("APA") and one of those statutes. First, Plaintiffs argue that the Toxic Substances Control Act, 15 U.S.C. § 4321 *et seq.* ("TSCA"), prohibits the export of PCBs without an exemption from Defendant Environmental Protection Agency ("EPA"), which may only be granted following formal rulemaking. Defendants acknowledge that EPA did not engage in rulemaking; instead, they rely on a May 2003 "enforcement discretion" letter from EPA stating that it would not enforce the PCB export ban against MARAD so long as certain conditions affecting the disposition of the ships are met. Second, Plaintiffs assert that the National Maritime Heritage Act, 16 U.S.C. § 5401 *et seq.* ("NMHA"), requires that MARAD, as the best value alternative, use a different disposal option for these ships because, Plaintiffs contend, towing for 45 days across the North Atlantic presents significant environmental risks. Finally, Plaintiffs argue that the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), directs MARAD and EPA to conduct an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") before exporting these ships. MARAD pre-

pared an EA entitled "Environmental Analysis of the Maritime Administration Ship–Disposal Program" in 1994 and one entitled "Environmental Assessment of the Sale of [NDRF] Vessels for Scrapping" in 1997. In addition, MARAD submitted reports to Congress on the status of the NDAA's Vessel Scrapping Program in April 2001 and June 2002, which the agency asserts are the "functional equivalent" of a supplemental EA. According to Plaintiffs, however, EPA has failed to supplement its EAs properly to account for new information related to current ship movements.

■■■ A TRO is an extraordinary remedy and should be granted sparingly. *Great Prince Michael v. United States,* 260 F.Supp.2d 23, 25 (D.D.C.2003). When presented with such a motion, the Court must examine whether "(1) there is a substantial likelihood plaintiff[s] will succeed on the merits; (2) plaintiff[s] will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other part[ies]; and (4) the public interest will be furthered by an injunction." [2] *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360 (D.C.Cir.1999). These factors "interrelate on a sliding scale" and a particularly strong showing on one may compensate for a weak showing on another. *Vencor Nursing Ctrs., L.P. v. Shalala,* 63 F.Supp.2d 1, 7 (D.D.C. 1999) (quoting *Davenport,* 166 F.3d at 361).

1. Substantial Likelihood of Success on the Merits [3]

The Court begins its analysis with Plaintiffs' TSCA claim. TSCA and its imple-

---

**2.** These same factors apply to both a preliminary injunction and a TRO. *Morgan Stanley DW Inc. v. Rothe,* 150 F.Supp.2d 67, 72 (D.D.C.2001).

**3.** Defendants argue in their opposition brief that Plaintiffs lack standing under Article III of the United States Constitution. At the motions hearing, however, Defendants conceded that the affidavit of Michael Town—which

menting regulations ban the export for disposal of PCBs in concentrations greater than 50 parts per million. 15 U.S.C. § 2605(e)(1), (3); 40 C.F.R. §§ 761.20, 761.97. An exporter may petition EPA for an exemption from this prohibition and the agency "may grant by rule such an exemption if the Administrator finds that—(i) an unreasonable risk of injury to health or environment would not result, and (ii) good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such [PCBs]." 15 U.S.C. § 2605(e)(3)(B); 40 C.F.R. § 761.20.

Like many statutes, TSCA contains a citizen-suit provision, whereby any person may commence a civil action "(1) against any person ... who is alleged to be in violation of this chapter ... or against [EPA] to compel [that agency] to perform any act or duty under this chapter which is not discretionary." 15 U.S.C. § 2619(a). Defendants argue that this provision also states, "No civil action may be commenced ... before the expiration of 60 days after the plaintiff[s have] given notice ...." *Id.* § 2619(b); *see also Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (construing a similar citizen suit provision under the Resource Conservation and Recovery Act of 1976). Plaintiffs submitted a notice of intent to sue under TSCA on September 8, 2003. Because 60 days have not yet passed since that event, any claim made *directly* under TSCA would be premature, leaving Plaintiffs with no likelihood of success.

■ However, Plaintiffs' TSCA claim actually arises under the APA. Plaintiffs allege that "MARAD's request that EPA exercise its enforcement discretion concerning TSCA's PCB export ban ... and EPA's grant of an exemption ... without rulemaking, are arbitrary, capricious, and not in accordance with procedures required by the APA ... [and] are agency actions unreasonably delayed and/or unlawfully withheld[.]" Complaint ¶¶ 35–36. The May 2003 letter by which EPA stated that it would not enforce TSCA against MARAD constitutes a final agency action subject to APA review. *See Bennett v. Spear,* 520 U.S. 154, 175–76, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("No one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA. The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' § 704, and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,' § 701(a)."); *see also id.* at 177–78, 117 S.Ct. 1154.

■ At this early stage of the litigation, the Court finds that Plaintiffs have not established a *substantial* likelihood that they can prove a violation of the APA based on TSCA. Defendants present a cognizable argument that EPA's decision not to enforce TSCA's prohibition on exporting PCBs is a matter vested within the discretion of that agency, not equivalent to granting an exemption. The Court is concerned that MARAD's export plan may violate 40 C.F.R. § 761.97, which appears to require MARAD to obtain an exemption before exporting PCBs at certain concen-

---

was filed that same day—establishes Plaintiff Sierra Club's standing for purposes of this TRO. Defendants continue to contest the standing of Plaintiff Basel Action Network, but it is not necessary to rule on that issue at this time.

trations, independent of whether EPA will enforce TSCA. However, this issue has not yet been briefed and is insufficiently clear to warrant the extraordinary remedy of an injunction. The parties should come to the preliminary injunction hearing prepared to discuss the implications of that provision.

Plaintiffs also seek interim injunctive relief under the APA for an alleged violation of NMHA. That law instructs MARAD, by September 30, 2006, to dispose of all ships listed in the NDRF's non-retention category "in a manner that provides the best value to the Government, except in any case in which obtaining the best value would require towing a vessel and such towing poses a serious threat to the environment[.]" 16 U.S.C. § 5405(c). Plaintiffs' first cause of action in their complaint alleges, in relevant part, that Defendants have arbitrarily and capriciously ignored the requirements of the NMHA in violation of the APA. Complaint ¶ 35. In Plaintiffs' opinion, better value options for disposal exist in the United States and trans-Atlantic towing is too risky.

■ MARAD has been working assiduously directly with Congress for many years to address the problems with the James River Fleet. For purposes of a TRO, Defendants have sufficiently demonstrated that MARAD "reasonably determined that the proposal by Post–Remediation Partners, LLC, submitted though the competitive program, to dismantle and recycle ships at the Able UK facility would result in the best value." Defendants' Opposition at 24. An affidavit from Curt Michanczyk, Program Manager for the MARAD Ship Disposal Program, lists the

factors considered by MARAD in making this decision. Declaration of Curt Michanczyk ¶ 40. Defendants have also shown the reasonableness of their conclusion that tandem towing of these ships will not "pose[ ] a serious threat to the environment[.]" 16 U.S.C. § 5405(c). Professional surveys of the towing arrangements have been filed with the Court evincing, to some extent, the relative safety of the towing process. In addition, defense counsel represented during the motions hearing that all liquid and removable solid PCBs would be purged from the ships prior to transit.[4] With respect to the Canisteo and the Caloosahatchee—the first two ships to be towed to England—Defendants submitted International Load Line Exemption Certificates from the United States Coast Guard "represent[ing] the . . . Coast Guard's determination that the vessels are seaworthy for the granted voyage, the tow from Norfolk to Teesside." Declaration of Shawn R. Ireland ¶ 5. Therefore, the Court finds that Plaintiffs' likelihood of success on their NMHA claim is not sufficient to merit the issuance of a temporary injunction.

The last substantive statute invoked by Plaintiffs is NEPA, which requires federal agencies to prepare an EIS or a "no significant impact" finding for all "major Federal actions significantly affecting the quality of the human environment[.]"[5] 42 U.S.C. § 4332(2)(C). Plaintiffs sue directly under NEPA, as well as via the APA.

Defendants cite *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C.Cir.1983), for the criteria a court should use when reviewing an agency's decision not to prepare an EIS:

---

**4.** Some PCBs, undoubtedly, will remain on the ships. However, "liquid PCBs present the largest environmental risk to the marine environment." Declaration of Michael C. Carter ¶ 12.

**5.** As an initial matter, the Court must determine whether the exportation for disposal of

NDRF vessels that contain PCBs constitutes a "major Federal action" for purposes of NEPA. Although exporting four ships might not be "major," the Court concludes that Plaintiffs are likely to succeed on their contention that thirteen ships rise to that level.

(1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Id.* at 1413. Defendants assert that the two EAs prepared by MARAD, along with the agency's reports to Congress, satisfy these criteria.

■ Plaintiffs correctly note that the 1994 and 1997 EAs, by themselves, are too remote for MARAD to make a "no significant impact" finding *for the 2003 Pilot Program.* Defendants counter that the two reports issued to Congress are the "functional equivalent" of a supplemental EA as actions taken pursuant to the NDAA Pilot Program. *See Amoco Oil Co. v. EPA,* 501 F.2d 722, 749 (D.C.Cir.1974) (holding that EPA's actions under the Clean Air Act exempted the agency from NEPA's requirement for an impact statement on the grounds that "the Clean Air Act provides, procedurally and substantively, for the 'functional equivalent' of compliance with NEPA"). *Amoco Oil's* "functional equivalent" standard compares actions required by one statute to the EA obligations imposed by NEPA. For those purposes, MARAD's reports filed pursuant to the NDAA fall under this "functional equivalent" standard, particularly in light of the fact that Congress was aware of them when it adopted the Pilot Program, which "calls for extraordinary expeditious

decision-making[.]" *Id.* at 750. These reports fulfill Defendants' obligations to complete a supplemental EA for four ships, the expressly-defined scope of the Pilot Program. *See* Bob Stump NDAA for Fiscal Year 2003, Pub.L. No. 107–314, § 3504(c)(2)(B), 116 Stat. 2458 (2002).

■ Beyond the statutory authorization for the Pilot Program and the concomitant reports to Congress, there is no statute to excuse MARAD's failure to conform fully to the nation's environmental laws while exporting the remaining ships. *See* Pub.L. No. 106–398, 114 Stat. 1654. NEPA requires a supplemental EA for any PCB-laden ships exported under different auspices. This has not been done. Therefore, while Plaintiffs have not shown their likelihood of success under NEPA for the four Pilot Program ships, they have for the remaining nine.[6] Before sending any additional NDRF vessels through the Chesapeake Bay and United States coastal waters, MARAD must perform, at a minimum, a supplemental EA specific to those ships that addresses the environmental impact of such action in the United States.

## 2. Irreparable Injury

A TRO enjoining MARAD from exporting for disposal more than four NDRF vessels would not substantially injure Defendants. At most, MARAD plans to export only six ships between now and the Court's decision on the motion for a preliminary injunction. Moreover, residents of the Tidewater region in Virginia would not be injured by a short delay in removing additional ships, as MARAD "does not believe the vessels pose an imminent risk of harm[.]" Defendants' Opposition at 40. Plaintiffs, in contrast, may experience se-

---

6. The number of NDRF vessels that MARAD intends to export for disposal is not entirely clear. Estimates range from 13 to 162. It is clear that MARAD has contracted with AbleUK to dispose of 13 ships, six of which

MARAD planned to tow to England in the fall of 2003 and seven of which would be towed in the spring of 2004, after the storm season in the North Atlantic.

vere harm from PCB and other contamination if an accident occurs while *en route* to the Atlantic Ocean in U.S. waters. Given the ephemeral nature of a TRO, the balance of injuries weighs in favor of Plaintiffs under these circumstances.

3. Public Interest

The public would be well served by requiring Defendants to comply with their statutory duty to prepare an EA before exporting additional ships containing PCBs, even if only the solid variety. Protecting the environment is an important public concern, as evidenced by the multitude of laws passed by Congress to that end. By permitting the exportation of four NDRF ships, the Court is also able to honor Congress's intent with respect to the Pilot Program.

For all of these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order is **GRANTED** in part and **DENIED** in part. It is

**FURTHER ORDERED** that Defendants are enjoined from exporting more than four NDRF vessels, which have been certified by the United States Coast Guard as seaworthy and with sufficient and safe towing arrangements for the purpose of crossing the Atlantic Ocean, until the Court has ruled on Plaintiffs' motion for a preliminary injunction. It is

**FURTHER ORDERED** that, no later than October 8, 2003, Defendants will file a motion on the issue of security under Rule 65(c) of the Federal Rules of Civil Procedure. It is

**FURTHER ORDERED** that a preliminary injunction hearing is scheduled for October 20, 2003, at 4:30 p.m.

**SO ORDERED.**