# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2011

No. 10-40785

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA, ex rel, BRADLEY SLOAN WRIGHT, on behalf of Harrold E. (Gene) Wright; ELIZABETH ANN WRIGHT, on behalf of Harrold E. (Gene) Wright; MARY JO KENNARD, as Attorney-in-Fact for her husband Don Kennard, n.c.m.,

Plaintiffs-Appellants

v.

COMSTOCK RESOURCES, INCORPORATED; COMSTOCK OIL & GAS, INCORPORATED,

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 9:98-CV-266

Before REAVLEY, GARZA, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Mary Jo Kennard, Bradley Sloan Wright, and Elizabeth Ann Wright (collectively "Relators") brought this qui tam action against Comstock Resources, Inc., and Comstock Oil & Gas, L.P., (collectively "Comstock") alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq.  The district court

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40785

granted Comstock's motion for summary judgment and denied Relators' motion for partial summary judgment. Relators now appeal. For the reasons stated herein, we affirm.

## I

This case concerns multiple state and federal mineral leases covering eleven different tracts of tribal lands of the Alabama and Coushatta Indian Tribes of Texas ("Tribe"). As Lessee, Comstock possessed mineral rights under each of the tracts and claimed royalties on mineral production. Relators assert that, for various reasons, these leases were expired, invalid, or violated by Comstock's trespass. According to Relators, the MMS-2014 forms, which Comstock was required to submit to the Government for determination of proper royalty amounts, were premised on these ineffective leases and therefore amounted to false claims under the FCA. The relevant facts, which the district court recited at length and which we now recite in brief, are best organized under the various tracts of land.

A federal agreement dated May 25, 1993, ("1993 Minerals Agreement") covers Tract 1. The 1993 Minerals Agreement contains a "no surface occupancy" provision ("NSO provision"), which states that "the Lessee shall not conduct drilling operations or otherwise use the surface of the lands covered by this lease for any operations of any kind or nature." Comstock's predecessor in interest, Black Stone Oil Company ("BSOC"), nevertheless obtained the Tribe's approval to drill Well No. 6 and Well No. 7 on Tract 1. Relators contend this violated the NSO provision and made Comstock a trespasser.

State of Texas leases cover Comstock's operations on part of Tract 2 and Tracts 3 and 4, all of which had an original expiration date of April 1, 1989. On March 28, 1989, BSOC and the Tribe entered into a lease extension agreement which extended the primary terms of all three leases. The Department of Interior ("DOI") subsequently approved the leases. However, title did not pass

from the State to the Federal Government until August of 1989, and Relators contend that the Government had no authority to approve the lease extension agreement. Thus, Relators submit that the leases were not validly extended and expired by their own terms in 1989.

State leases originally covered part of Tract 2 and Tracts 5, 6, and 11, and Relators asserted the expiration of these leases in their First Amended Complaint. Comstock responded at the district court that, if the state leases did expire, its operations were nevertheless covered by a federal minerals agreement dated July 23, 1990, ("1990 Minerals Agreement"). Relators now contend that the 1990 Minerals Agreement also expired.

Lastly, State leases covered Tracts 7, 8, 9, and 10, all of which were set to expire in late 1982. Just before their expiration, the State executed an agreement pooling the various tracts of land into one unit. After the leases' expiration dates, the Tribe and BSOC entered into a ratification agreement, declaring the leases in the pool as still in effect, even though they had, by their own terms, expired. The Government approved the ratification agreement. Relators now contend that, because the effective date of the ratification agreement predated the expiration of the leases covering Tracts 7 and 9, the ratification was ineffective as to these leases.

Relators originally filed this qui tam action in the District Court for the Eastern District of Texas, but a Multi-District Litigation Panel transferred the case to the District Court of Wyoming, which dismissed Relators' claims for lack of subject-matter jurisdiction. On appeal, the Tenth Circuit reversed. The Wyoming district court subsequently remanded this case to the Eastern District of Texas, where Relators moved for partial summary judgment that Comstock was a trespasser. Comstock responded by moving for complete summary judgment. The district court granted Comstock's motion and entered judgment against Relators, who now appeal.

No. 10-40785

## II

We review the district court's summary judgment decisions *de novo,* applying the same standards as the district court. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir. 1999). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). A fact issue is "material" if its resolution could affect the outcome of the action. *Id.* When reviewing summary judgment decisions, we construe all facts and inferences in the light most favorable to the non-moving party. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).

## III

Initially, we must address Comstock's argument that we cannot dispose of this action without joining the Tribe as a party. Rule 19 of the Federal Rules of Civil Procedure mandates that a party must be joined if (1) "in that person's absence, the court cannot accord complete relief among existing parties" or (2) "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest." FED. R. CIV. P. 19(a)(1). "Determining whether an entity is an indispensable party is a highly-practical, fact-based endeavor, and Federal Rule of Civil Procedure 19's emphasis on careful examination of the facts means that a district court will ordinarily be in a better position to make a Rule 19 decision than a circuit court would be." *Hood ex rel. Miss. v. City of Memphis, Tenn.*, 570 F.3d 625, 628 (5th Cir. 2009)

## No. 10-40785

(internal quotation marks and citation omitted).  Accordingly, we review the district court's denial of a motion to dismiss for failure to join an indispensable party for abuse of discretion.  *See HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003).

As Relators correctly point out, although they attack the validity of the underlying leases, they only do so in order to prove a false claim and recover penalties.  Moreover, Comstock and the Tribe, in previous litigation, entered into a settlement agreement declaring each of the leases "valid and in full force and effect, and binding upon the Tribe."  Thus, the Tribe's rights under the leases will remain unchanged.  In any event, the Tribe enjoys sovereign immunity, and we could not join them even if they were indispensable.  *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991).  Neither could the Tribe intervene, as the FCA does not allow anyone other than the Government to intervene in qui tam actions.  *See* 31 U.S.C. § 3730(b)(5).  Thus, the district court did not abuse its discretion in concluding that the Tribe need not be included.[1]

## IV

The False Claims Act provides that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty."  31 U.S.C. § 3729(a)(1).  In determining whether liability attaches under the FCA, we ask "(1) whether there was a false statement or fraudulent course of conduct;[2]

---

[1] Comstock also contends that Relators' claims are barred because the FCA does not authorize a challenge to the Government's actions; because the Administrative Procedures Act bars Relators' collateral challenge to the Government's approval of leases; because Relators are not the original source of their allegations; and because their claims are barred by the doctrine of res judicata.  Except where the original source doctrine is discussed, *infra*, in Part IV.C.2, we need not address these issues, as Relators' claims fail on the merits.

[2] At the outset, Comstock asserts that the MMS-2014 forms contain no affirmative statements about the validity of the leases, and therefore cannot form the basis for an FCA

No. 10-40785

(2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (internal quotation marks omitted). By its own terms, the FCA imposes no liability unless the alleged violator "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). As we explained in *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228 (5th Cir. 2008), this means that "the evidence must demonstrate 'guilty knowledge of a purpose on the part of [the defendant] to cheat the government,' or 'knowledge or guilty intent.'" *Id.* at 231 (citations omitted).[3] Thus, Relators must raise a fact issue not only as to whether Comstock made false or fraudulent claims, but also as to whether it knowingly committed fraud. For the following reasons, we conclude that Relators have failed to do so.

---

claim. The question of whether an implied assertion can constitute a false statement for FCA purposes has, in different contexts, been at times addressed and at times ignored by this court. Like the court in *Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010), we need not answer this question. *See id.* at 268. ("We need not resolve the issue today, because in any event the factual allegations in Steury's amended complaint provide no basis for implying a false certification."). Assuming *arguendo* that Comstock's implied assertions may constitute false statements under the FCA, we would still require Relators to raise a fact issue as to (1) the validity of the leases and (2) the scienter requirement.

[3] In challenging the district court's grant of summary judgment on the issue of intent, Relators urge us to overrule our decision in *Taylor-Vick*, which they contend failed to properly consider the 1986 amendments to the FCA. But this Court recited in full the same provisions Relators now suggest we overlooked. *See Taylor-Vick*, 513 F.3d at 230; *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

No. 10-40785

## A

First, Relators assert that the Government's approval of certain leases was not in accordance with various statutory requirements, and that those leases are therefore invalid. Relators cite no case law which directly supports the proposition that the alleged statutory violations amount to fraud under the FCA. Neither does the following "statutory mosaic," as it is termed by Relators, itself compel Relators' attenuated connection between the statutes and the FCA. Specifically, Relators contend (1) that the Indian Mineral Development Act ("IMDA") provides the mechanism by which governmental consent to tribal leases is given; (2) that such consent is predicated on compliance with the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"); (3) that the Government's failure to strictly comply with these requirements renders its consent ineffective; and (4) that the Indian Non-Intercourse Act ("INIA") mandates that, absent effective governmental consent, the leases are invalid. *See* Indian Mineral Development Act, 25 U.S.C. §§ 2101-2108 (subjecting mineral leases with Indian tribes to the approval of the Secretary of the Interior and acknowledging that the Secretary may be required to conduct an environmental impact statement under NEPA); National Environmental Policy Act, 42 U.S.C. § 4321, et seq.; Endangered Species Act, 16 U.S.C. § 1531, et seq. (requiring federal agencies to ensure that all authorized actions do not jeopardize the continued existence of an endangered species); Indian Non-Intercourse Act, 25 U.S.C. § 177 (invalidating conveyances of or claims to Indian lands absent federal consent).

Relators are correct that the IMDA is consistent with the INIA in adhering to the longstanding principle that dealings of the Indian Tribes require approval of the sovereign.[4] *See* 25 U.S.C. § 177 ("No . . . conveyance of lands, or of any

---

[4] The court in *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994), explained the purpose of the INIA:

No. 10-40785

title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity . . . unless the same be made by treaty or convention entered into pursuant to the Constitution."); 25 U.S.C. § 2102(a) (stating that an Indian tribe's entry into a lease agreement is "subject to the approval of the Secretary"). But where courts have delineated the elements of a claim under the INIA, they have required proof that governmental consent is lacking. *See, e.g.*, *Seneca Nation of Indians v. New York*, 382 F.3d 245, 258 (2d Cir. 2004) (requiring proof that "the United States never approved the conveyance"); *Narragansett Tribe of Indians v. S. Rhode Island Land Dev. Corp.,* 418 F. Supp. 798, 803 (D. R.I. 1976) (requiring proof that "the United States has never consented to the alienation of the tribal land"). Relators would have us take this a step further and declare consent ineffective where it did not comport with the strictures of NEPA and ESA. But we find the INIA—a statute designed to secure governmental consent—an inappropriate vehicle for invalidating leases to which the Government has, in fact, consented. Adopting Relators' approach would turn upside down the INIA's anointment of the Federal Government as protector, and we have found no authority to support Relators' argument.

Relators also submit that if we do not invalidate the leases, the NEPA and ESA requirements are without effect, and they urge this Court to construe the IMDA in such a way as to render none of its provisions inoperative.[5] But taking

---

> In enacting the Nonintercourse Act Congress codified the widely accepted principles that Indian nations held "aboriginal title" to land they had lived on from time immemorial and that discovering nations held "title in fee," subject to the Indians' rights to occupancy and use of the land. From these two principles flowed the notions that "aboriginal title" could not be extinguished without a sovereign act and, therefore, any conveyance without the sovereign's consent was invalid.

*Id.* at 56 (citing *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 233-34 (1985)).

[5] The IMDA requires that "the Secretary shall not be required to prepare any study regarding environmental, socioeconomic, or cultural effects of the implementation of a Minerals Agreement, apart from that which may be required under [NEPA]," 25 U.S.C. §

Comstock's suggested reading does no harm to these statutes—the NEPA and ESA requirements may be enforced with an injunction against further activity pending compliance. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988) ("The proper remedy for substantial procedural violations of NEPA and ESA is an injunction."). Relators cite Ninth Circuit case law unwinding lease extensions for failure to comply with NEPA requirements. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006). But, in the absence of Fifth Circuit or Supreme Court precedent counseling otherwise, we do not find *Pit River Tribe* persuasive in a case involving an indirect challenge to leases via the FCA.[6] In any event, *Pit River Tribe* fails to advance Relators' argument that the NEPA and ESA requirements are ineffective unless we invalidate the leases. A court may enjoin further activity until compliance. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1462 (9th Cir. 1988) ("[Because NEPA and ESA were violated] the agencies are enjoined from allowing any surface-disturbing activities on the lands already leased and from selling any more leases . . . until they comply with NEPA and the ESA.").

In short, a reasonable jury could not conclude that, on the basis of this "statutory mosaic," Comstock knowingly defrauded the Government. Whatever violations may have occurred, the FCA is not a "blunt instrument" for enforcing federal statutes. *See Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001); *United*

---

2103(b), and NEPA requires the preparation of an environmental impact statement. 42 U.S.C. § 4332(2)(C). In addition, the ESA requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2).

[6] Relators also note that, in cases where courts have approved injunctive relief, they have also granted declaratory relief and forbidden the issuance of leases in contravention of NEPA. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983); *Hodel*, 852 F.2d at 1230; *Conner v. Burford*, 848 F.2d 1441, 1443 (9th Cir. 1988). According to Relators, this case law compels us to invalidate the leases. But Relators do not merely ask us to declare that the government must comply with NEPA and ESA. Relators instead ask us to reach back and invalidate consent previously given, and find Comstock's actions violative of the FCA.

No. 10-40785

*States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (holding that "claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA") (citing *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977)); *see also Steury*, 625 F.3d at 268.  As we stated at the outset, Relators must not merely raise a fact issue as to statutory compliance; Relators must raise a fact issue as to whether Comstock knowingly defrauded the Government. We conclude that Relators have failed to do so.

**B**

Second, Relators assert that, when BSOC drilled the No. 6 and No. 7 wells on Tract 1, they violated the NSO provision of the 1993 Minerals Agreement, thereby becoming trespassers.  The NSO provision states:  "[n]otwithstanding any provision of this lease to the contrary, the Lessee shall not conduct drilling operations or otherwise use the surface of the lands covered by this lease for any operations of any kind or nature."   But if Comstock's MMS-2014s were fraudulent, they were so because they claimed royalties on minerals which Comstock did not rightly own—not because the lease had been violated by trespass. And, as Comstock notes, the 1993 Minerals Agreement also stated that "the material breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease or cause a termination or reversion of the estate hereby created . . . ."  Thus, any trespass which Comstock may have committed on the surface estate did not affect Comstock's claims to the mineral estate, and the corresponding MMS-2014s were not false or fraudulent.

**C**

Lastly, Relators contend that leases covering part of Tract 2, and Tracts 3 and 4; part of Tract 2, and Tracts 5, 6, and 11; and Tracts 7 through 10 all expired at the end of their primary terms.  Comstock maintains that each of the leases was extended for various reasons.

No. 10-40785

**1**

After the primary terms of leases covering Tracts 2, 3, and 4 had, by Comstock's admission, expired, the Tribe entered into a lease extension agreement, which the Government approved. Because the Alabama and Coushatta Restoration Act of 1987 ("the Act") gave the Tribe federal recognition and restored the "trust relationship between the United States and the tribe," BSOC (and, apparently, the Government) believed that the Government had authority to approve the extension. 25 U.S.C. § 733(a). However, it was not until August of 1989 that the State conveyed the Tribe's land to the Government.[7] Thus, the lease extension was signed while the Government was acting as trust supervisor, but before it held legal title. Relators claim the Government needed legal title to approve the extension; Comstock claims it only needed the existence of a "trust relationship." Put another way, Relators reason that, because the Act did not expressly grant the Federal Government the right to manage the Tribe's leases, such a right stays with the titleholder under general principles of property law.

But we cannot divorce the question of leasing jurisdiction from the traditional framework of federal supervision over Indian affairs. Like the district court, we find instructive the Supreme Court's guidance in *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661 (1974). The *Oneida* Court, in evaluating a claim by Indian nations to invalidate a cession of tribal lands to the state of New York, declared that "the Indians are treated as the wards of the United States, and it is only pursuant to the Federal authority that

---

[7] The Act does not require the conveyance of Indian lands in order to restore the Tribe to federal trust status. *See* 25 U.S.C. § 736(a) ("The reservation is hereby declared to be a Federal Indian reservation for the use and benefit of the tribe without regard to whether legal title to such lands is held in trust by the Secretary."). The Act merely instructs the Federal Government to accept any offer from the State to convey title to any lands. *See* 25 U.S.C. § 736(b)(1).

their lands can be granted or demised by or acquired by conveyance or leased from them." *Id.* at 673 n.8 (citation omitted). The Court also made clear that the Federal Government's authority to regulate such lands was not dependent on whether the Government held legal title.[8] *Id.* at 670.

Relators challenge the district court's reliance on *Oneida* and distinguish it on the basis that it involved a challenge to the transfer of title under the INIA. But *Oneida* also stands for the general proposition that, in the traditional relationship between Government and tribe, the Government's regulatory powers are not contingent upon title. Relators would have had Comstock go to the State for approval and have their leases with the Tribe subject to state, rather than federal, oversight. But, as we explained above, dealings with federally recognized tribes require federal, not state, supervision.

Furthermore, Relators have failed to raise an issue as to the requisite scienter. Absent direct evidence, no reasonable jury could infer that Comstock knowingly claimed royalties under expired leases when (1) the Federal Government was acting as trust supervisor for the Tribe, and (2) Comstock sought and acquired the Federal Government's approval of the lease extension.

**2**

Relators also challenge the 1990 Minerals Agreement covering Tracts 2, 5, 6, and 11. Relators averred in their complaint that previous state leases

---

[8] The *Oneida* Court explained more fully:

> The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State. But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law.

*Oneida*, 414 U.S. at 670 (citation omitted).

covering these tracts were invalid and mentioned the 1990 Minerals Agreement and its expiration in relation to Tract 2.  But Relators did not assert that the 1990 Minerals Agreement expired for failing to produce minerals on Tracts 5 and 6 until after Comstock cited the Agreement in response to Relators' claims that the State leases were expired.  The district court, citing the "original source" requirement of the FCA, declined to address this challenge to the 1990 Minerals Agreement on the grounds that Relators failed to include it in their First Amended Complaint.

The FCA grants jurisdiction over claims based on publicly disclosed information only when the plaintiff is the "original source."  *See* 31 U.S.C. § 3730(e)(4)(a) ("The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . [unless] the person bringing the action is an original source of the information.").  An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  *Id.* § 3730(e)(4)(B).  Thus, the so-called "original source doctrine" limits recovery under the FCA to those who have "direct knowledge of the alleged false claims that is independent of the public disclosure," and who have "functioned as a true whistleblower."  *Hays v. Hoffman*, 325 F.3d 982, 990 (8th Cir. 2003).

Moreover, the Supreme Court has explained that an FCA plaintiff must be the original source for the claims in the original complaint, as well as those in the amended complaint.  *See Rockwell Int'l Corp. v. United States ex rel. Stone*, 549 U.S. 457, 473 (2007) ("In our view, the term 'allegations' is not limited to the allegations of the original complaint.  It includes (at a minimum) the allegations in the original complaint as amended.").  In other words, the Court

has endorsed inquiring as to *each claim* whether a federal court has jurisdiction, rather than relaxing the original source requirements once the action is underway. *See United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) (holding that an FCA claimant could not use the amendment process to create jurisdiction for claims not pressed in the original complaint). Thus, because Relators did not assert that the 1990 Minerals Agreement expired for non-production on Tracts 5 and 6 until after Comstock raised the agreement as a defense, Relators are not the original source for this claim.

### 3

Lastly, Relators contend that the ratification agreement covering Tracts 7, 8, 9, and 10 failed to validly extend the leases because the agreement went into effect before the expiration of the leases covering Tracts 7 and 9. Relators submit that the agreement could not have ratified those leases if they were not yet expired. We find no merit in this contention. As Relators concede, the various leases were pooled into a single unit and ratified together. The ratification agreement, dated approximately seven years after the expiration of the leases, declares specifically that "it is the desire of the Alabama-Coushatta Tribe to adopt, ratify and confirm said above described Leases, to grant, lease and let said lands . . . and to adopt, ratify, and confirm the pooling of said lands." We find no basis in law (and neither do Relators direct us to any) for invalidating the ratification because it was given an "effective date" which predated the expiration of two of the leases in the pool.

Even if we grant Relators' argument that the effective date of the ratification rendered it partially null, Comstock would have to have known, deliberately ignored, or recklessly disregarded this fact. In simply alleging that the ratification agreement, properly approved by the Government, was an attempt by BSOC to "paper over" the expiration of the previous leases, Relators

fall short of raising a triable fact issue of whether Comstock knowingly defrauded the Government.

## V

Ultimately, we find merit in none of Relators' arguments that Comstock knowingly submitted fraudulent MMS-2014s in violation of the False Claims Act.  We do not find a basis in the "statutory mosaic" cited by Relators for invalidating any of the leases; we conclude that any alleged violations of the NSO provision of the 1993 Minerals Agreement did no harm to the mineral estate; and we see no merit in Relators' arguments that any of the leases were not validly extended or ratified.  Furthermore, in all instances, Relators have failed to create a genuine issue of material fact as to whether Comstock possessed the requisite scienter.  Accordingly, we AFFIRM the district court's grant of summary judgment in favor of Comstock.  In addition, Relators' motion to substitute Mary Jo Kennard, as Attorney-in-Fact for her husband Don Kennard, to Mary Jo Kennard, as Independent Executor of the Estate of Don Kennard, is GRANTED.